WAYNE COUNTY DEPARTMENT OF HEALTH v OLSONITE
CORPORATION

1. Health and Environment—Statutes—Common Law—Nuisance—Precedence.

   The Legislature, with its paramount concern for the protection of the state's natural resources from pollution, impairment or destruction, intended the Environmental Protection Act to supersede the common law of nuisance to the extent that these respective bodies of law conflict (MCLA 691.1201 *et seq.;* MSA 14.528[201] *et seq.).*

2. Health and Environment—Statutes—Environmental Protection Act—Common Law Standards—Changes in Technology.

   The provision in the EPA allowing trial courts to adopt pollution standards serves as a legislative recognition that unforeseen changes in technology may permit the judicial adoption of standards more precise, and perhaps more exacting, than those previously required under the common law of nuisance. (MCLA 691.1202(2); MSA 14.528[202]).

3. Appeal and Error—Equity—Evidence—Clear Error.

   The Court of Appeals will not reverse a chancery decision which is supported by the evidence unless, in view of the entire evidence, the appellate court is left with the definite and firm conviction that a mistake was made by the lower court (GCR 1963, 517.1).

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 61 Am Jur 2d, Pollution Control §§ 116, 117.
[3] 5 Am Jur 2d, Appeal and Error § 880 *et seq.*
[4] 61 Am Jur 2d, Pollution Control §§ 184–186.
[5–7] 61 Am Jur 2d, Pollution Control § 37 *et seq., § 123 et seq.*
[8, 9] 61 Am Jur 2d, Pollution Control § 185.
[10] 61 Am Jur 2d, Pollution Control § 190.
[11] 61 Am Jur 2d, Pollution Control § 172.
[12] 61 Am Jur 2d, Pollution Control § 120.
[13] 61 Am Jur 2d, Pollution Control § 146.

4. HEALTH AND ENVIRONMENT—PROBABLE DEGRADATION—PRIMA FA-
   CIE CASE—VARIATION OF EVIDENCE—NATURE OF DEGRADATION.

   Probable as well as actual degradation of the environment may
   be considered by a court when deciding whether a plaintiff in
   an environmental pollution action has made a prima facie
   showing of pollution; the evidence necessary to establish a
   prima facie case will vary with the nature of the alleged
   environmental degradation involved.

5. COURTS—HEALTH AND ENVIRONMENT—ENVIRONMENTAL PROTEC-
   TION ACT—EVIDENCE—ADOPTION OF STANDARDS—REGULATORY
   AGENCIES—ASSESSMENT—APPEAL AND ERROR.

   A court may adopt a standard approved under the Environmental
   Protection Act by a regulatory agency only after the court
   assesses the validity, applicability and reasonableness of the
   standard (MCLA 691.1202[2] [a]; MSA 14.528[202] [2] [a]).

6. COURTS—HEALTH AND ENVIRONMENT—ENVIRONMENTAL PROTEC-
   TION ACT—VALIDITY OF STANDARDS—METHOD OF DETERMINA-
   TION—APPEAL AND ERROR.

   A trial court in an EPA suit could not have determined the
   validity, applicability and reasonableness of plaintiff agency's
   standards on odor pollution where (1) the record did not clearly
   disclose whether other states or agencies had adopted the same
   or similar standards, (2) the plaintiff agency's standards were
   neither officially compiled nor mentioned in the governing
   regulation, (3) the standards did not guage the cumulative
   effect of multiple emission sources from a single plant, and (4)
   there was no explanation why a pattern of citizen complaints
   was unlikely to appear at a given emission level. (MCLA
   691.1202[2] [a]; MSA 14.528[202] [a]).

7. HEALTH AND ENVIRONMENT—PRIMA FACIE CASE—PREPONDERAT-
   ING EVIDENCE—RECORD.

   A prima facie case of actual and probable environmental degrada-
   tion was satisfactorily established by preponderating evidence
   where the record showed: (1) there were numerous complaints
   by citizens of the area over a lengthy period that foul odors,
   recurrently emitted from the defendant's factory, penetrate
   their homes and cause such adverse physical reactions as
   nausea, burning eyes, headaches, loss of sleep and reduction of
   appetite; (2) inspectors of the local health agency verified the
   citizen complaints; (3) defendant failed to produce the necessary
   empirical evidence in rebuttal; and (4) the trial court gave

credence to the plaintiff's evidence while disbelieving that of defendant.

8. HEALTH AND ENVIRONMENT—BURDEN OF PROOF—ENVIRONMENTAL PROTECTION ACT—EVIDENCE—AFFIRMATIVE DEFENSES.

The normally applicable rules on burden of proof and weight of evidence, requiring the plaintiff to carry the burden of proving the case by preponderating evidence does not apply where a statutory affirmative defense is asserted under the Environmental Protection Act; a defendant asserting a statutory affirmative defense under the act has the burden of proving the defense by a preponderance of the evidence (MCLA 691.1203[1]; MSA 14.528[203][1]).

9. HEALTH AND ENVIRONMENT—BURDEN OF PROOF—FEASIBLE ALTERNATIVES—PUBLIC INTEREST.

A plaintiff who demonstrates harm or likelihood of harm to the environment from the defendant's conduct in an action brought under the state Environmental Protection Act places upon the defendant a heavy burden of Environmental justification; the defendant must then prove that no feasible and prudent alternatives to his actions exist and that his conduct is consistent with the promotion of the public health, safety and welfare.

10. APPEAL AND ERROR—HEALTH AND ENVIRONMENT—COURTS—FEASIBLE AND PRUDENT ALTERNATIVES—BURDEN OF PROOF—TEST.

A trial court did not err in concluding that alternative controls of odor were technically feasible in an environmental protection action where the defendant did not meet its burden of proving the alternatives unfeasible or imprudent; environmental regulatory standards may be economically feasible even though they are financially burdensome, affect profit margins adversely, or threaten the continued existence of individual employers who have lagged behind the rest of the industry in protecting the safety of the environment; alternative systems of pollution control are not imprudent where they do not involve costs of extraordinary magnitude or other truly unusual factors.

11. NUISANCE—COMPELLING FACTORS—PRIOR EXISTENCE.

The fact that a defendant's painting operation began after the establishment of adjacent residences would be a compelling factor militating against the defendant's victory in an action wherein it is alleged that the painting operation constituted a common law nuisance.

12. HEALTH AND ENVIRONMENT—POLLUTION—PRIMA FACIE CASE—AP-
PEAL AND ERROR.

A trial court did not err in concluding that a defendant had
failed to rebut a plaintiff's prima facie case of environmental
pollution where the record revealed that the defendant failed to
recognize (1) that citizen complaints continued even after de-
fendant's reinstitution of a solvent with lower odor-causing
potential and (2) that the energy shortages which necessitated
defendant's switching to more odorous solvents may recur.

13. HEALTH AND ENVIRONMENT—POLLUTION—PRIMA FACIE CASE—AP-
PEAL AND ERROR.

Plaintiff in an EPA suit is not required to recommend a system of
odor abatement guaranteed to eliminate all citizen complaints
since a "feasible" alternative under the EPA comprehends an
approach which is *likely* to work out or be put into effect
successfully. MCLA 691.1203(1).

Appeal from Wayne, Horace W. Gilmore, J.
Submitted June 24, 1977, at Detroit. (Docket No.
77-114.) Decided November 22, 1977. Leave to
appeal denied, 402 Mich 845.

Complaint by the Wayne County Department of
Health, Air Pollution Control Division, against
Olsonite Corporation seeking an injunction barring
further pollution of the air in Wayne County and
requiring the installation of air pollution control
devices at defendant's factory. Judgment for plain-
tiff. Defendant appeals. Affirmed in part and re-
manded for further proceedings.

*William L. Cahalan,* Prosecuting Attorney, and
*Donald A. Campbell* and *Joseph B. Klein,* Assist-
ant Prosecuting Attorneys, for plaintiff.

*Honigman, Miller, Schwartz & Cohn* (by *Robert
A. Fineman* and *Herschel P. Fink),* for defendant.

Before: D. C. RILEY, P. J., and BASHARA and P. R. MAHINSKE,* JJ.

D. C. RILEY, P. J. This is a suit for injunction, brought under the aegis of the Michigan Environmental Protection Act, MCLA 691.1201 *et seq.;* MSA 14.528(201) *et seq.* Following a nine-day trial that began on November 23, 1976, plaintiff Wayne County Health Department, Air Pollution Control Division, (hereafter, "the Division"), secured a decree from the lower court directing defendant Olsonite Corporation to adopt within a stated period "a specific supplemental odor control system" capable of achieving emission limits set by the court.

The Division, empowered to investigate, prevent and abate causes of air pollution within Wayne County and to enforce the Wayne County Air Pollution Control Regulation, (hereafter, "the Regulation"),[1] filed the present suit on October 12, 1973. Its complaint alleged that Olsonite, a domestic corporation located at 8801 Conant Avenue,

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] The Regulation, in pertinent part, provides:

"Section 6.5 General Prohibition:

"a. It shall be unlawful for any person to permit or cause the emission of such quantities of air contaminants from whatever source in such place or manner as to be detrimental to any person or to the public or to endanger the health, comfort, or safety of any person or the public, or in such manner as to cause injury or damage to property or business."

"Section 1.3 Definition of Terms. * * *

"Air Contaminant: Any gaseous, liquid, or solid matter, which when present in the outdoor atmosphere contributes to a condition of air pollution, including, but not limited to dust, soot, mist, smoke, fumes, flyash, cinders, gases, vapors, aerosols, and *odors.* (Emphasis added.)

"Air Pollution: The presence in the outdoor atmosphere of one or more air contaminants or combinations thereof in such quantities and of such duration and characteristics which are or may tend to be injurious to human, plant, or animal life, or property, or which interfere with the comfortable enjoyment of life or property or the conduct of business."

Hamtramck, Michigan, "has discharged and continues to discharge" into the ambient air "obnoxious and foul odors" which threaten to pollute, impair or destroy the atmosphere and which endanger the health, welfare and safety of residents in the vicinity.

Olsonite, situated amid other industrial facilities and bordering residential areas to the east, north and south, manufactures molded plastic toilet seats, steering wheel inserts and various flexible plastic parts used by the automotive industry. Of these items, only the flexible plastic parts require painting at Olsonite's plant on Conant. The parties do not dispute that, as an incident of the painting process, certain pungent odors are produced which, if unrestrained, are then emitted into the atmosphere and carried off by prevailing winds. The crux of the controversy, however, centers on the effectiveness of Olsonite's present method of restraining its paint fumes from entering the atmosphere.

The painting operation, conducted weekdays on a single shift from 7 a.m. to 3:30 p.m., employs an overhead conveyor system by which parts to be painted are passed through a series of four paint spray booths, a flash-off chamber and a bake oven. In addition, Olsonite uses a chain-on-edge conveyor which carries parts through an enclosed painting machine. Necessary finishing is then performed in two separate paint spray booths. In all, according to defendant, there are ten potential sources from which odor may emanate.

Paint is electrostatically applied by automatic spray equipment located in front of the booths. The paint, specified by Olsonite's customers, is a proprietary urethane enamel produced by PPG, Inc. In addition to certain known solvents that are

part of PPG's paint formula, Olsonite is required to add other solvents in connection with the painting process. Originally Olsonite utilized a solvent blend of Toluol and Xylol as recommended by PPG. During 1973, however, because of the energy crisis, these solvents became unavailable and Olsonite allegedly was required to switch to a blend containing solvents with lower odor thresholds (and thus higher odor potential) than those in the original Toluol-Xylol blend. In February 1975, the original blend became available again and has been used by Olsonite since that time. These solvent blends, it should be noted, are not water soluble.

Each of the paint spray booths is equipped with devices which form a curtain of water designed, primarily, to trap wayward particles of paint and, secondarily, to prevent the emission of odors into the atmosphere. The water curtain is maintained by a system drawing recirculated water from a tank at the base of each spray booth through a pipe to a manifold at the top of the booth. The manifold contains a number of uplifted nozzles which discharge water against and over a series of baffles controlling the flow and splash of water to form, when fully functional, a continuous curtain of water. Owing to the use of recirculated water, the nozzles at times become clogged by accumulations of paint, causing breaks in the curtain. Through these breaks, paint particles, solvents and exhaust materials escape into the stacks and thence into the ambient air. Olsonite has from time to time modified its operation in an effort to improve the water curtains by adding more baffles, using additional weirs in the water tanks, purchasing extra manifolds to replace those that become clogged and installing (four to five weeks prior to

trial) a filtration system that skims excess parti-
cles from the recirculated water. In addition, Ol-
sonite has established a procedure for periodic
inspection and maintenance of its painting opera-
tions.[2]

At the trial, the Division presented the following
evidence to establish its prima facie case: 1. Five
field inspectors, employed by the Division, testified
regarding inspections and surveillance they con-
ducted at or near the Olsonite facility from 1972 to
the time of trial. According to their testimony, the
inspectors, although not formally enrolled in odor-
detection courses, did receive instruction and
training on the subject. One of the inspectors,
witness Zabick, described the nature of the orien-
tation available to the Division's inspectors:

"Q. *[Mr. Donald A. Campbell, Assistant Prosecuting
Attorney]* I would like you to tell the Court specifically,
if you can, the type of material which is contained, for
instance, in the EPA *[i.e.,* the United States Environ-
mental Protection Agency] manuals? For instance, do
they talk about technique? I mean, you said you have
read manuals which deal with odor, is that correct?
"A. That is right.

---

[2] According to defense witness Edmund Szajna, Olsonite's director
of manufacturing, maintenance of the painting operation at the time
of trial included:

a) daily scraping of excess paint from the spray booths; twice daily
skimming of each booth's water tank; and thrice daily replacement of
the water filters on booths 2 and 3.

b) dismantling and cleaning of two spray booths and changing of
manifolds on these booths each weekend.

c) weekly inspection, and cleaning (where necessary) of roof exhaust
stacks.

d) unplugging of nozzles at the end of the shift, whenever the paint
foreman observed water-curtain deterioration. On approximately six
occasions in the three years prior to trial, the paint line had been
shut down to permit such emergency repairs. Thus, if unobserved
deterioration of the water curtains occurred, untreated exhaust fumes
were released into the atmosphere.

"Q. Can you be a little more specific as to what specifically you read about concerning odors?

"A. Sources of different types of odors right from rendering plants to paint making operations to odors in steel making, types of control devices, methods of detecting it, various type charts to use to detect levels of odors, numerical system of evaluating them, methods of positioning yourself, making a complete around-the-source surveillance, up wind, down wind, the complainant's role in determining the severity of an odor.

"THE COURT: I think that is fine, Mr. Zabik [sic]. Are these manuals available to all the inspection staff of the agency?

"THE WITNESS: Yes."

The testimony of the inspectors essentially revealed that on frequent instances from 1973 to the date of trial they had been summoned, often by radio run and almost invariably at the behest of complaining citizens, to verify alleged odors issuing from Olsonite's plant. The voluminous inspection reports and violation notices, entered at trial to show defendant's knowledge that complaints had arisen, describe the alleged odors either in narrative fashion (e.g., "very high", "very pronounced", "pungent", "slight odor") or by means of a Division-adopted Odor Detection Chart,[3] a variant of the US EPA Odor Detection Chart.[4]

---

[3] "Schedule of Odor Intensity

"0 A concentration of an odorant which produces no sensation.

"1 Concentration which is just barely detectable.

"2 A distinct and definite odor whose characteristic is clearly detectable.

"3 An odor strong enough to cause a person to attempt to avoid it completely.

"4 An odor so strong as to be overpowering and intolerable for any length of time." Plaintiff's Exhibit #2, p 36-E.

[4] "Concentration

"0—A concentration of an odorant which produces no sensation.

"1—Concentration which is just detectable (the threshold dilution).

"2—A distinct and definite odor whose unpleasant characteristics are revealed or foreshadowed (the recognition threshold).

Each of these detection charts employs a numerical rating system designed to eliminate the ambiguity inherent in narrative descriptions of odor intensity.

The inspectors' testimony, backed by their reports, discloses many instances where odors specifically attributable to Olsonite's painting process were assigned a numerical value of "2" or "2+" and, on fewer occasions, "3". Although these odors abated at times, especially after February, 1975, when Olsonite returned to use of the Toluol-Xylol blend, the reports indicate that inspectors Gribbs, Krawiec and Zabick frequently noted in 1975 and 1976 detectable paint odors emitted by Olsonite.

2. The lower court admitted office records of the Division which indicate that the Division received 59 citizen complaints against Olsonite in 1973, 38 in 1974, 24 in 1975, and 13 as of August 31, 1976.

3. Thirteen citizens, living north, east and south of the Olsonite complex, testified at trial. These witnesses relayed to the court complaints they registered with the Division and with Olsonite concerning odors, generally characterized as paint-like, very distinctive, unpleasant and offensive, emanating from the Olsonite complex. According to the largely unrebutted testimony of the citizens, the odors caused nausea, burning eyes, headaches, loss of sleep and a reduction in appetite; in addition, the fumes penetrated their homes and were particularly obnoxious during periods of warm weather.

In instances when inspectors and citizens had been asked whether they could distinguish between odors attributable to Olsonite and those of

"3—An odor strong enough to cause a person to attempt to avoid it completely.
"4—An odor so strong as to be overpowering and intolerable for any length of time." Defendant's Exhibit #3.

other neighboring industries, the witnesses stated that they had no difficulty in differentiating the various smells. One inspector did mention, however, that the paint odors ascribed to Olsonite and those issuing from a nearby Chrysler facility "were somewhat similar, but there are generally differences between one type of odor from one operation to the other" that a person "very familiar with the different plants" would detect.

4. Dr. Peter Warner, the Division's laboratory supervisor and an expert on odors and odor measurement, testified regarding various field samplings and laboratory analyses of gases emitted from Olsonite's stacks; these tests began in November, 1972, and continued sporadically up to March, 1976.

During his testimony, Dr. Warner explained the method utilized to retrieve a sample of Olsonite's stack effluent[5] and then described the manner in which the relative concentration of an odor is determined in the laboratory. This latter task employs a five-member odor panel consisting of odor-sensitive individuals capable of distinguishing between three odors at successively lower concentrations. Once selected, each odor panelist is subjected to varying concentrations of stack effluent diluted with clean air and a determination is made regarding the lowest concentration at which over 50 percent of the panel can detect any odor from

[5] The method is similarly, but more concisely, described in a November, 1975 report co-authored by Dr. Warner:

"Odor Sampling Procedure

"Samples for * * * evaluation are collected by withdrawing source effluent through a twelve inch long glass or stainless steel probe into a 300 ml gas pipet by means of a 75 ml rubber aspirating bulb attached to the exit end of the pipet. Connections are made with a one to one and one-half inch piece of tygon tubing. Sixty squeezes are considered adequate to overcome such effects as wall absorption. Glass gas sampling bottles have stopcocks at each end to insure the integrity of each collection." Plaintiff's Exhibit #12, p 6.

the samples. Thus, the greater the number of dilutions required, the more intense is the odor under scrutiny. Once the lowest concentration of stack effluent, discernible by over half of the panel, is ascertained, calculations are then made to express the concentration in odor units per cubic foot of air.

In analyzing the results of this testing, the Division has established certain recommended guidelines similar to those employed by "a number of agencies and states";[6] the Division's guidelines describe odor emission levels which, if not exceeded, are "acceptable"[7] to the Division: 150 odor units per cubic foot or one million odor units per minute (*i.e.,* odor units per cubic foot times cubic feet of exhaust gas per minute).

The November, 1972, stack tests conducted at Olsonite by the Division showed that of the two potential emission sources tested, *viz.,* the drying

---

[6] The only trial testimony on the point is this:

"Q. *[Mr. Campbell, Assistant Prosecuting Attorney]* Dr. Warner, you have used a figure of 150 odor units per cubic feet *[sic].* Are there any other agencies in the country that use these same guidelines?

"A. Yes, quite a number of agencies and states have adopted regulations which specify the emission limits of sources to a given number of odor units per cubic foot. For example, the State of Minnesota, Connecticut, Illinois—

"MR. FINEMAN: *[Attorney For Defendant]* (Interposing) I am going to object, your Honor. What has been done in other states at this point is irrelevant until it is shown that the State of Michigan or this County or anybody else that we are concerned with has done so. There is nothing in this record and in fact there is nothing in existence that indicates this State or this County or agency has adopted anything that has the binding force of law.

"THE COURT: Well, I am interested in what they are doing. I want to learn something about it. Go ahead.

"THE WITNESS: Other states have adopted various responses to odor problems." Trial Transcript November 30, 1976, pp 50–51.

[7] "The term 'acceptable' is used to describe a condition in which no pattern of citizen odor complaints has developed to relate any odor source or odor relatable process to an odor nuisance in the community as confirmed by the appropriate district inspector." Plaintiff's Exhibit #12, p 7.

oven and flash-off chamber, both fell well within the Division's guidelines; the report on the November tests concluded: "it is unlikely that the above source represents any appreciable community odor problems."

Stack tests conducted in October, 1973, measuring emissions from seven sources (five paint spray booths, the flash-off chamber and drying oven) disclosed levels far exceeding the Division's guidelines for both odor concentration and odor emission rate.[8] These results coincided with the change in solvents necessitated by the energy crisis.

Stack testing performed in August, 1974, found odor levels in excess of the Division's guidelines in the three spray booths tested, while the flash-off chamber and drying oven emission levels fell below the guidelines.[9]

No testing occurred in 1975.

In March, 1976, stack tests conducted at Olsonite's request, measuring emissions from spray booth number two, revealed odor levels (i.e., in odor units per cubic foot) below the Division's

---

[8]

TABLE I

U-100 PAINT LINE OCTOBER 1, 1973 ODOR SAMPLING SUMMARY

| Sampling Designation | Odor Units/ft³ at 50% of Panel Reporting Positive Olfactory Response | CFM[1] | Emission Rate Odor Units/Minute | Sampling Temp. °F |
|---|---|---|---|---|
| Spray Booth No. 2 | 940 | 13,900 | 13,100,000 | 70 |
| Spray Booth No. 3 | 440 | 13,900 | 6,120,000 | 72 |
| Spray Booth No. 4 | 7000 | 13,900 | 97,300,000 | 72 |
| Flash Off Chamber | 390 | 3,500 | 1,370,000 | 100 |
| Drying Oven | 2000 | 2,500 | 5,000,000 | 190 |

[1] Flow rate from Olsonite Company

guidelines, but emission rates *(i.e.,* in odor units per minute) slightly above the guidelines in two of four samples tested.[10] Olsonite had requested the

TABLE II

VINYL PAINT LINE OCTOBER 2, 1973 ODOR SAMPLING SUMMARY

| Sampling Designation | Odor Units/ft³ at 50% of Panel Reporting Positive Olfactory Response | CFM¹ | Emission Rate Odor Units/Minute | Sampling Temp. °F |
|---|---|---|---|---|
| Spray Booth No. 5 (Top Coat) | 7 | 10,000 | 70,000 | 70 |
| Spray Booth No. 7 (Chain-On-Edge) | 1850 | 2,500 | 4,630,000 | 72 |

¹ Flow rate from Olsonite Company
Plaintiff's Exhibit #12, p 8.

[9]

TABLE I

| Sampling Site | Odor Level ou/ft³ |
|---|---|
| Booth #2 | 2800 |
| Booth #3 | 370 |
| Booth #4 | 171 |
| Flash-Off Chamber | 115 |
| Oven | 39 |

Plaintiff's Exhibit #12, p 13.

[10] "Results

| Sample | Date and Description* | Odor Level ou/ft³ | Emission Rate (ou/min) |
|---|---|---|---|
| S₁ | 3–9–76   Water curtain only | 43 | 488,000 |
| S₂ | 3–9–76   Water curtain only | 21 | 238,000 |
| S₁ | 3–12–76   Water curtain with 1-1/2 percent aqueous potassium permanganate | 103 | 1,165,000 |
| S₂ | 3–12–76   Water curtain with 1-1/2 percent aqueous potassium permanganate | 97 | 1,098,000 |

* Note figure 1 and 2."
Plaintiff's Exhibit #12, p 18.

March tests to measure the effectiveness of using aqueous potassium permanganate as a pollution abatement technique. The tests, conducted on two occasions in March, first measured the effectiveness of the water curtain alone and then with the addition of the permanganate. Prior to the initial test, certain changes in the spray booth had been effected:

"1. Redistribution of the total paint sprayed per day to relieve the loading on the booth No. 2 stack and to more equally distribute the rate of spray to other booths which were formerly used to apply lighter coats to parts.

"2. Cleaning and improvement of the water curtain plumbing and pumping system.

"3. Installation of a baffle to reduce the water travel distance at the throat of the water curtain." Trial Exhibit 12, p 16.

In his report on the March tests, Dr. Warner discounted the effectiveness of permanganate as an additive and noted an "apparent measured improvement" in the utility of the tested water curtain as an odor suppressant; however, he reserved judgment on the system as a whole:

"[I]t is necessary to determine any change in the odor output of the other adjacent booths and stacks, as odor sources, as a result of changes in the operation of booth No. 2, before any claim is made to an overall condition of odor abatement." Trial Exhibit 12, p 18.

Moreover, Dr. Warner observed a deterioration in water-curtain efficiency from the first March test to the second attributable to plugged nozzles which thus "allowed an estimated 15 to 35% of the solvent mist to enter the booth No. 2 stack untreated". *Id.* at 19. Nonetheless, he concluded:

"[I]n view of the apparent effectiveness achievable by water curtain improvements coupled with techniques in redistribution of solvent, this approach should be explored further by the company." Trial Exhibit 12, p 19.

Dr. Warner amplified the point in his testimony by stating that an improved water curtain "would certainly be an excellent approach to a solution" but the reliability of the curtain "is the only unknown factor. Our experience with reliability has been very poor". The court then asked Dr. Warner to indicate other odor abatement techniques potentially available to Olsonite. With the qualification that he was not an engineer, Dr. Warner listed the following: fume incineration (afterburners); a scrubbing system combined with a packed tower containing fragments of absorptive material; and carbon adsorption.

Following Dr. Warner's testimony, plaintiff rested. Olsonite then moved for a directed verdict but the court denied the motion.

The first defense witness, Mr. Gerald Eggers, Olsonite's manager of industrial engineering, described his duties, the painting process at Olsonite, the various modifications undertaken to improve the water curtain, and efforts made to obtain a positive pollution-control system for the company. According to Mr. Eggers, each of these systems— (a) odor masking agents, (b) odor counteractants, (c) scrubbers and chemical absorption systems, (d) catalytic converters, (e) afterburners, (f) tall stacks, (g) recuperative combustion devices, (h) refrigeration and, (i) activated carbon adsorption—has drawbacks that make its use unacceptable for the company.

For example, he testified that masking agents, which merely camouflage the odor, are unacceptable to the Division; that odor counteractants tested

by Olsonite proved erratic and at times created additional odor; that systems based on carbon adsorption or catalytic conversion are ineffective because the paint used by Olsonite will contaminate the carbon or catalyst used in these systems, and, further, that catalytic converters pose an inherent risk of explosion; that tall stacks erected at a cost of $417,000 by Ford Motor Company for its Utica painting operation still draw citizen complaints; and that chemical absorption, using ozone, presents potential dangers created by ozone. Mr. Eggers also conveyed budgetary quotes he received for certain methods of odor control.[11] On cross-examination, the witness often exhibited lapses of memory when questioned on the extent of his investigations into alternate odor control systems and on the identities of persons he contacted in this quest. He acknowledged, however, that no pilot tests or engineering drawings had been commissioned by defendant; that no efforts had been made to negotiate reductions in the quoted costs or

---

[11] These budgetary figures, which may vary by 10 percent in either direction, are:

(a) Afterburner—capital investment: $816,000-$1,200,000; annual operating cost: $160,000 to $580,000, varying inversely with initial capital cost.

(b) Scrubber with chemical packed tower—capital investment: $814,000; annual operating cost: not ascertained.

(c) Catalytic converter—capital investment $514,000 to $939,000; annual operating cost: $150,000-$300,000, varying inversely with initial capital cost.

The reason the annual operating costs of afterburners or catalytic converters vary inversely with the initial capital cost is that the larger capital investment includes heat exchangers, devices which will recoup a portion of the energy spent on odor incineration for use in heating factories or firing ovens. Thus, as letters to Olsonite from manufacturers producing such equipment assert, heat exchangers may well provide "fuel economies" or "a substantial total energy cost reduction." (Emphasis in original.)

We also note that the figures quoted above presume that the same type of equipment will be used on Olsonite's ten odor sources, irrespective of the amount of emissions emanating from any single source, and further, that structural changes in Olsonite's plant will not be necessary.

to ascertain whether less expensive equipment might be used on Olsonite's less offensive odor sources; and that he had never submitted to management a "formal capital appropriation request" for any of the proposed systems. Further, he maintained that while the companies submitting budgetary quotes promised odor reductions of 95 to 97 percent, none would guarantee the elimination of all odors.

Three additional defense witnesses followed Mr. Eggers to the stand. Mr. Edmund Szajna, defendant's director of manufacturing, explained maintenance procedures covering Olsonite's painting operation. Mr. Arthur W. Sempliner, Olsonite's first vice-president, described Olsonite's products, gave financial and employment data on Olsonite,[12] explained an odor sampling technique conducted by Olsonite's employees in 1976, noted the possibility that expensive odor abatement methods might entail a shutdown of the entire plant and stated that on his way to work he occasionally smells a paint odor, indistinguishable from Olsonite's, emanating from a nearby Chrysler plant. Mr. Sempliner also offered the view that no prudent or feasible alternative to the water curtain exists which could solve Olsonite's problem of odorous

---

[12] Olsonite employs between 600 and 700 salaried and hourly employees at its Hamtramck facilities with an average weekly payroll of about $150,000. These facilities represent a current investment in plant and equipment of approximately $20,000,000.

The total annual sales generated by Olsonite from its Hamtramck operations roughly exceed $34,000,000. Of this amount, approximately $11,000,000 is attributable to the painted parts operation. The annual gross profit on only the painted parts operation is approximately $1,250,000.

The record does not disclose financial data on Olsonite's operations nationally, the annual gross profit of Olsonite's Hamtramck facility or the number of employees assigned to the painted parts operation.

In addition, it should be noted that Olsonite bids competitively with other suppliers for the opportunity to provide Detroit automakers with painted parts. At present, Olsonite is the sole, outside supplier of such parts.

emissions. Lastly, Mr. Henry Wojtaszek, the director of Olsonite's central staff, testified regarding defendant's painting process, the nature of the paint and solvents employed, Ford's limited success with tall stacks and Olsonite's recent experimentation with spray applicators which may be able to reduce the amounts of solvent and paint used from 25 to 50 percent.

Following closing arguments, the lower court requested and received proposed findings of fact and conclusions of law from the parties. On December 15, 1976, the court issued an opinion finding, *inter alia,* that:

1) the "complaints [of the citizen witnesses] were justified";

2) "the odors came from defendant's plant";

3) "[t]he inspection reports established the existence of a number two odor on repeated occasions throughout the period in question, and on some occasions a number three odor";

4) "an acceptable level of odor strength is an emission of less than 150 odor units per cubic foot or a total of one million odor units per minute";

5) "[t]he [October] 1973 tests conclusively established that defendant polluted the air contrary to the Act";

6) the March, 1976 tests revealed "two samples out of four that exceeded acceptable levels and polluted the air"; and

7) "the use of water curtains, baffles and filters, no matter how well cleaned and maintained, is not sufficient to prevent air odor pollution."

From the foregoing, the trial court concluded that plaintiff had "established its prima facie case". See MCLA 691.1203(1); MSA 14.528(203)(1). Next, concluding that defendant had failed to rebut plaintiff's prima facie case, the court ruled:

"the tests [conducted] by company employees * * * are of the most self serving nature and in no way rebut the convincing testimony of the inspectors, the residents of the neighborhood, and the scientific tests of Dr. Warner. Furthermore, it is significant that not one of the company employees who conducted the tests was called to testify, subject to cross examination." *Wayne County Department of Health, Air Pollution Control Division v Olsonite Corporation,* Wayne County Circuit Court No. 73-252680-CE, issued December 15, 1976, pp 7–8.

The court then surveyed existing methods of pollution control available to defendant, along with their attendant costs, and cited Olsonite's employment and revenue figures, noted *supra,* in concluding that any one "of the suggested methods is economically feasible and prudent".

Thus the court found:

"There are a variety of odor control techniques available, some of which have been listed. Defendant has failed to establish that there is no feasible or prudent alternative to the continued pollution. In fact, except for some work with the water curtain system and some minor tests with counteractants, defendant has failed to try any method and has failed in its affirmative defense to show that there is no feasible and prudent alternative.

"It is also clear that the conduct of defendant is not consistent with the promotion of the public health, safety and welfare in light of the state's paramount concern for the protection of its natural resources from pollution. In fact, defendant throughout, although appearing to cooperate and treat complaints with sympathy and seriousness, has failed to take any effective means to control or attempt to control the air pollution it has created. The defendant has been well aware of the pollution problem for many years, and although many solutions were potentially available, defendant failed to employ any of them except to attempt to clean up the water curtains.

"Defendant contends that it has taken affirmative action in planning a new system that will reduce the amount of paint used and involving the water curtain device. The fact remains, however, that there is no showing that these plans will solve the continuing pollution problem." *Wayne County, supra* at 9–10.

Lastly, the trial court ended its opinion by making conclusions of law and ordering injunctive relief:

### "IV *CONCLUSIONS OF LAW*

"The Court having found that plaintiff has established its prima facie case affirmatively, that defendant has failed to rebut plaintiff's prima facie case, and that the defendant has failed to establish as an affirmative defense that there is no feasible and prudent alternative to his conduct and that the conduct is consistent with the promotion of the public health, safety and welfare, it must follow as a matter of law that plaintiff is entitled to relief.

"Defendant argues, however, that even in the face of the statute, the Court must consider the character, quality and nature of the locality where defendant operates.

*        *        *

"The arguments of defendant state many propositions of general nuisance law, all of which were enunciated prior to the enactment of the Environmental Protection Act of 1970. By this statute, the Legislature defined the standards to be used and the method to be determined by the Court in deciding cases where there is a claim of environmental pollution. The standards set out in the statute are clear and unequivocable, and to the extent that the prior law relating to nuisance varies from the statute, the statute must control. Plaintiff has established its prima facie case, which has not been rebutted, and defendant has failed in its affirmative defense.

"But even if general nuisance law were to be applied, plaintiff still would have to prevail. It has established by both objective and subjective standards, conduct

which has polluted the air. It has established that there are feasible methods to control the pollution. And defendant has failed to rebut plaintiff's case. It therefore follows that the plaintiff is entitled to relief.

"V *RELIEF ORDERED*

"It is obvious that an order must be entered enjoining the defendant from continuing to pollute the air. At the same time defendant must be given a reasonable time to reach full complaince [sic].

"To accomplish this, it is ordered that defendant forthwith at its own expense conduct pilot testing of prototype odor control systems to compile operating and odor control data. Such tests shall be monitored by representatives of plaintiff and be completed by March 1, 1977. The results shall be made available to the Court at that time.

"On or before April 1, 1977, defendant shall select a specific supplemental odor control system and timetable for its installation and completion. This system shall achieve odor emission limits of no more than 150 odor units per cubic foot and no more than one million odor units per minute under odor evaluation tests to be approved by plaintiff. Defendant shall submit to the Court its timetable for installation and completion, which shall be approved by the Court after hearing.

"If after installation of the equipment on or before a date approved by the Court, defendant at any time emits more than 150 odor units per cubic foot or one million odor units per minute under odor evaluation tests run in accordance with procedure outlined by plaintiff, plaintiff may move this Court for supplemental injunctive relief.

"The Court will retain jurisdiction of the case. Costs to plaintiff." *Wayne County, supra* at 11–14.

On defendant's motion, a panel of this Court stayed enforcement of the injunction by an order dated February 7, 1977.

In its appellate brief, defendant seeks review of four issues. The first is whether the trial court correctly ruled that the Environmental Protection

Act (EPA) supplants prior doctrines of common law nuisance to the extent these doctrines conflict with the act.

Two Michigan Supreme Court cases offer insight on the issue. In *Ray v Mason County Drain Commissioner,* 393 Mich 294; 224 NW2d 883 (1975), Justice WILLIAMS, writing for a nearly unanimous Court, recognized the EPA as the Legislature's response to the mandate of Const 1963, art 4, § 52:[13]

"The Legislature in establishing environmental rights set the parameters for the standard of environmental quality but did not attempt to set forth an elaborate scheme of detailed provisions designed to cover every conceivable type of environmental pollution or impairment. Rather *the Legislature spoke as precisely as the subject matter permits and in its wisdom left to the courts the important task of giving substance to the standard by developing a common law of environmental quality. The act allows the courts to fashion standards in the context of actual problems as they arise in individual cases and to take into consideration changes in technology which the Legislature at the time of the act's passage could not hope to foresee."* 393 Mich at 306–307. (Footnote omitted; emphasis supplied.)

In a note accompanying the foregoing passage, the Court observed:

"While the language of the statute paints the standard for environmental quality with a rather broad stroke of the brush, the language used is neither illusive nor vague. 'Pollution', 'impairment' and 'destruc-

---

[13] Const 1963, art 4, § 52 provides:

"Sec. 52. The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction."

tion' are taken directly from the constitutional provision which sets forth this state's commitment to preserve the quality of our environment. In addition these and other terms used in establishing the standard have acquired meaning in Michigan jurisprudence. The development of a common law of environmental quality under the EPA is no different from the development of the common law in other areas such as nuisance or torts in general, and we see no valid reason to block the evolution of this new area of common law." 393 Mich at 307, fn 10.

Similarly, see *State Highway Commission v Vanderkloot,* 392 Mich 159, 184; 220 NW2d 416 (1974), opinion of WILLIAMS, J.;

"It is most important to note that EPA does not, as both parties imply, merely provide a separate *procedural* route for protection of environmental quality, it also is a source of supplementary *substantive* environmental law. See Sax and Conner, *Michigan's Environmental Protection Act of 1970: A Progress Report,* 70 Mich L Rev 1004, 1054–1064 (1972)." (Emphasis in *Vanderkloot.)*

Defendant gleans from the cited cases a requirement that the EPA be interpreted in harmony with existing Michigan law. In further support of its argument, defendant cites *Crandall v Biergans,* Clinton County Circuit Court No. 844, 3 ERC 1827 (1972), and an analysis of that case coauthored by Professor Sax, the initial draftsman of the EPA. See Sax and Conner, *supra* at 1066–1067.

In *Crandall,* a two-count odor-pollution suit alleging nuisance and an EPA violation, the court refused to enjoin defendant's operation of a hog farm or to order relocation of defendant's barn,

"so long as defendants continue their operation in a careful and husbandlike manner and use such odor

control products or devices as are from time to time available and developed and are economically feasible. In short, it is the opinion of the Court that on balance the equities are in favor of defendants and that they are not maintaining a nuisance." 3 ERC at 1830.

Turning to the EPA, the court in *Crandall* recognized that no standards regulating porcine odors had yet been established, see MCLA 691.1202(2); MSA 14.528(202)(2),[14] and, disclaiming an ability to set standards on its own, interpreted § 3 of the act as "in effect saying that some balance has to be maintained between absolutely no pollution and the carrying on of activities necessary to human existence". 3 ERC at 1831. The court then indicated that if defendants hold "the odor entering the atmosphere * * * to a practical minimum" they will have established an affirmative defense under the EPA, *id.;* see MCLA 691.1203(1); MSA 14.528(203)(1). The court cautioned, however, that a balancing of interests on a case by case basis would be appropriate "[u]nless there are definite standards set". 3 ERC at 1831–1832.

In commenting on the *Crandall* decision, Professors Sax and Conner remarked that the court apparently adopted common law standards on odor control,

"where none previously existed in legislation or administrative rules; and * * * the judge enforced those

---

[14] "(2) In granting relief provided by subsection (1) where there is involved a standard for pollution or for an anti-pollution device or procedure, fixed by rule or otherwise, by an instrumentality or agency of the state or a political subdivision thereof, the court may:

"(a) Determine the validity, applicability and reasonableness of the standard.

"(b) When a court finds a standard to be deficient, direct the adoption of a standard approved and specified by the court." MCLA 691.1202(2); MSA 14.528(202)(2).

standards by finding that the defendants had complied with the policy of the EPA, a policy that is *largely* coextensive with the law of nuisance *as he applied it in this case". Michigan's Environmental Protection Act of 1970: A Progress Report,* 70 Mich L Rev 1004, 1067. (Emphasis supplied.)

We need not disagree with either *Crandall* or the Sax-Conner analysis of that case in order to reject defendant's contention that traditional principles of nuisance law *must always* control in an EPA action. *Crandall,* unlike the present case, resorted to nuisance law because no definitive standards had been established. Here, however, the lower court, presumably on the authority of MCLA 691.1202(2); MSA 14.528(202)(2), adopted odor emission standards set by the Division.

In our view, MCLA 691.1202(2); MSA 14.528(202)(2) serves as a legislative recognition that unforeseen "changes in technology", *Ray, supra* at 307, may permit the judicial adoption of standards more precise, and perhaps more exacting, than those previously required under the generalized language of the common law of nuisance. Surely, it is not unreasonable for the Legislature to have concluded that plaintiffs and defendants alike would prefer explicit but attainable standards of conduct in place of the uncertainties attending a balancing-of-the-equities analysis under the law of nuisance.

Moreover, to hold, as defendant urges, that the standards of conduct required by the EPA are coterminous with those imposed by the common law of nuisance would eviscerate the substantive facets of the act, *Ray, supra* at 306, and condemn as mere surplusage all but its procedural remedies. Given our state's *"paramount* concern for the protection of its natural resources from pollution,

impairment or destruction",[15] we believe the Legislature intended the EPA to supersede the common law of nuisance to the extent these respective bodies of law conflict.[16]

Defendant also assails as erroneous and unsupported by the evidence various factual findings of the trial court. Although an appellate court reviews chancery suits *de novo,* we apply the "clearly erroneous" standard of GCR 1963, 517.1. See 2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 596. Compare *Causley v LaFreniere,* 78 Mich App 250, 254–255, fn 2; 259 NW2d 445 (1977), and *Miller v Magline, Inc,* 76 Mich App 284, 293–294; 256 NW2d 761 (1977).[17] Under this test, a finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made. *Tuttle v Department of State Highways,* 397 Mich 44; 243 NW2d 244 (1976). For convenience, our examination of the trial court's assertedly erroneous findings will track the statute.

### Prima Facie Case of Pollution

Initially it should be noted that probable as well

---

[15] Emphasis supplied.

*See also* the similarly phrased provision in Const 1963, art 4, § 52.

[16] This holding obviates discussion of defendant's second issue, namely, whether Olsonite's operation constitutes a nuisance. We would note, however, a compelling factor militating against defendant's victory on this issue: Defendant's painting operation began *after* the establishment of adjacent residences. Thus, the citizens have not "come to the nuisance". *See, e.g., Robinson v Baugh,* 31 Mich 290, 293 (1875).

[17] The Supreme Court would be well advised to reconcile the apparent conflict between the "clearly erroneous" test of GCR 1963, 517.1 and the *de novo* standard applied in equity actions. In a given case, the particular standard of review may well determine the victor on appeal.

as actual degradation of the environment may be considered in deciding whether plaintiff has made a prima facie showing of pollution. *Ray, supra* at 309. Moreover, the evidence necessary to establish a prima facie case "will vary with the nature of the alleged environmental degradation involved". *Id.*

Defendant cites four trial court findings as clearly erroneous:

"1. The Trial Court found that there have been innumerable complaints by citizens of the area as to odors of an unpleasant nature coming from the Olsonite Plant." (Appellant's Brief at 38.)

"2. The Trial Court found that the [Division's] inspection reports established the existence of a No. 2 odor on repeated occasions, and on some occasions a No. 3 odor and that repeated violation notices have been served on defendants." *(Id.* at 39.)

"3. The Trial Court found the 1976 [Division] laboratory tests based upon stack samples exceeded acceptable levels and polluted the air." *(Id.* at 41.)

"4. The Trial Court found that the effectiveness of the water curtain to control odorous solvent emissions is very doubtful and that it is clear that the use of water curtains, baffles and filters, no matter how well cleaned and maintained, is not sufficient to prevent odor pollution." *(Id.* at 42.)

Regarding the first finding, defendant asserts that the record demonstrated "serious problems of [odor] attribution and identification"; defendant notes 1) the similarity of Olsonite's alleged odor to that of other industrial concerns, 2) the failure to detect any number 4 odors and only a single number 3 odor in the two years prior to trial, 3) the absence of violation notices since April, 1975, and 4) the absence of scientific or medical evidence showing the harmfulness of Olsonite's odors.

We do not find the judge's initial finding to be clearly erroneous. The great majority of citizens and inspectors who testified remained firm in attributing the recurrent odors as emanating from Olsonite's factory. That the intensity of the odors may have diminished in the two years preceding trial does not refute the probable environmental degradation established at trial by citizen witnesses who complained of serious physical symptoms caused by Olsonite's odors in 1975 and 1976. Plaintiff was not obliged to offer scientific or medical evidence of health impairment, for the judge believed the "convincing testimony" of the citizens. Moreover, the absence of violation notices is explained by the inspectors' testimony that the Division had directed them to cease issuing such notices because of Olsonite's failure to respond affirmatively to previous notices.[18]

Nor is the second finding clearly erroneous. Although the judge characterized a number 2 odor as "distinctly unpleasant" whereas the Division's

[18] Similarly, as reflected by the following citizen testimony, typical of at least two others, the diminution of citizen complaints may well have been attributed to futility rather than a reduction in odor:

"Q. *[Attorney For The Defendant]* [Y]ou have only made one complaint for all of 1976?

"A. *[Witness]* Right, only one.

"Q. And that was on June 11th, 1976?

"A. I think so.

"Q. You haven't had occasion to complain since then?

"A. The smell is there, but for personal reasons I would not state why I did not call.

"Q. You would not state why you didn't call?

"A. Yes, because of frustration. The whole neighborhood is frustrated with this thing for being dragged out for such a length of time, so I did not call on every occasion.

"Q. Didn't stop you in the past, did it?

"A. Well, from the beginning I was very much interested in the cause. After I retired, I thought I was going to have some peace and quiet, and I face this now. And trying to get something done about it and having it just drag on and on * * * " Tr. November 29, 1976, p 31.

odor intensity schedule characterizes a number 2 odor as distinct, definite and clearly detectable, the testimony of two inspectors discloses that the Division staff did not limit the number 2 intensity to the recognition threshold as defendant asserts, but gave it a range starting at the clearly detectable level up to an odor level just short of a number 3 intensity. Since defendant does not suggest that the distinct, clearly detectable odor of its paint and solvents is by any means fragrant and since the inspectors' reports were entered merely to show the existence of citizen complaints, we do not find the lower court's slight misdescription to constitute clear error.

Turning to the third finding, *i.e.,* stack samples exceeding acceptable levels and polluting the air, again we do not discern clear error in the judge's finding that stack samples tested by Dr. Warner had exceeded and continued to exceed odor emission levels denominated "acceptable" by the Division. We are disturbed, however, by what appears to be a premature adoption of standards governing odor emissions, *viz.,* 150 odor units per cubic foot or one million odor units per minute.

Under MCLA 691.1202(2)(a); MSA 14.528(202)(2)(a), a court may adopt an agency-approved standard after having assessed "the validity, applicability and reasonableness of the standard". As noted, *supra,* Dr. Warner's testimony relative to the Division's standards did not clearly disclose whether other states had adopted the identical standards employed by the agency; rather, he indicated, without adequate citation, that "quite a number of agencies and states have adopted regulations which specify the emission limits of sources to a given number of odor units per cubic foot * * * [and that] [o]ther states have

adopted various responses to odor problems".
Moreover, we note that the Division's laboratory
guidelines are neither officially compiled nor men-
tioned in the Regulation; that the guidelines do
not guage the cumulative effect of multiple emis-
sion sources from a single plant;[19] and that no
showing has been made explaining why a pattern
of citizen complaints is unlikely to appear at a
given emission level. Without an examination of
the above factors, the lower court could not have
determined "the validity, applicability and reason-
ableness of the standard". Thus, the judge acted
prematurely in adopting the Division's guidelines.

This holding does not, however, suggest either
that the Division's standards are indeed "defi-
cient", MCLA 691.1202(2)(b); MSA 14.528(202)(2)(b),
or that plaintiff has failed to establish a prima
facie case of pollution. The former must await
further inquiry by the trial court and the latter is
to be decided, *infra,* by this panel.

Defendant's fourth allegation of a clearly erro-
neous factual finding involves the effectiveness of
the water curtain as a pollution-control device.
Despite the improvements in water filtration and
paint spray application, the maintenance proce-
dures employed, and the reports by Dr. Warner
suggesting some improvement in water-curtain
efficiency, we do not believe the lower court clearly
erred in finding that the water curtains are not
sufficient to prevent odor pollution. Adequate evi-
dence supported the court's finding: 1) many of the
solvents employed are *not* water soluble; 2) the
second test in March, 1976, conducted at Olsonite's
request under optimal maintenance procedures,
revealed a deterioration of the water curtain from
15 to 35 percent since the previous test three days

---

[19] This factor suggests that the Division's guidelines may be too lax.

earlier; and 3) the March tests measured emissions from a single spray booth rather than from the system under normal operations. Thus, we do not share defendant's definite and firm conviction that the court erred in finding the water curtain to be unreliable.

Accordingly, we hold that plaintiff satisfactorily established by preponderating evidence a prima facie case of actual and probable environmental degradation.

### Rebuttal By Defendant of Plaintiff's Prima Facie Case

Defendant challenges two trial court findings: 1) that the trial court improperly discounted the odor tests conducted by Olsonite in 1976; and 2) that "defendant has failed to rebut the existence of community odor problems in the past or present, or demonstrate that such problems will not continue into the future". (Opinion, p 8.)

We agree with the trial court's assessment of the weight he attached to Olsonite's employee-conducted odor tests. The reports were prepared after institution of the present suit by employees untrained in odor detection. These self serving tests in no way measure up to the kind of "empirical studies" which are "necessary when the impact upon the environment resulting from defendant's conduct cannot be ascertained with any degree of reasonable certainty". *Ray v Mason County Drain Commissioner,* 393 Mich 294, 311; 224 NW2d 883 (1975).

To counter the court's second finding defendant argues principally that the judge failed to note that the number of citizen complaints appeared to wane in direct relation to Olsonite's reinstitution

in February, 1975, of its Toluol-Xylol blend of solvents. This argument disregards the presence of continuing complaints in 1975 and 1976 and it presumes, somewhat myopically, that the energy shortages which necessitated the switch to higher odor-producing solvents will not recur. Given defendant's misconceptions, we hold the trial court did not err in concluding that defendant had failed to rebut plaintiff's prima facie case.

As the present suit illustrates, then, in the absence of properly approved standards, MCLA 691.1202(2); MSA 14.528(202)(2), a case of actual and probable environmental degradation is nonetheless established where 1) numerous citizens complain over a lengthy period that foul odors, recurrently emitted from defendant's plant, penetrate their homes and cause such adverse physical reactions as nausea, burning eyes, headaches, loss of sleep and reduction of appetite; 2) inspectors of the local health agency verify the citizen complaints; 3) defendant fails to produce the necessary empirical evidence in rebuttal; and 4) the trial court gives credence to the plaintiff's evidence while disbelieving that of defendant. In that event, unless defendant asserts and wins success on the statutory affirmative defense, the trial court, in the exercise of discretion, may order injunctive relief.

*Feasible, Prudent Alternatives and Conduct Consistent With the Promotion of Public Health, Safety and Welfare*

In relevant part, § 3(1) of the EPA states:

"The defendant may also show, by way of an affirmative defense, that there is no feasible and prudent alternative to defendant's conduct and that such con-

duct is consistent with the promotion of the public health, safety and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment or destruction. *Except as to the affirmative defense, the principles of burden of proof and weight of the evidence generally applicable in civil actions in the circuit courts shall apply to actions brought under this act."* MCLA 691.1203(1); MSA 14.528(203)(1). (Emphasis added.)

We interpret the language italicized above to say that the normally applicable rules on burden of proof and weight of the evidence, requiring plaintiff to carry the burden of proving its case by preponderating evidence, *Ray, supra* at 309–311, shall not apply where an affirmative defense is asserted. See Haynes, *Michigan's Environmental Protection Act in its Sixth Year: Substantive Environmental Law from Citizen Suits,* 53 Journal of Urban Law 589, 599 (1976) ("[O]nce a plaintiff in a MEPA lawsuit demonstrates that a defendant's actions harm, or are likely to harm, the environment, the defendant carries a *heavy burden of environmental justification. This burden requires a defendant to prove* that no feasible and prudent alternatives to his actions exist and that he is acting in the public interest." [Emphasis added; footnote omitted.])

If "the private citizen [is to have] a sizable share of the initiative for environmental law enforcement", *Eyde v Michigan,* 393 Mich 453, 454; 225 NW2d 1 (1975), then the only reasonable construction[20] of the statute is to place the burden of proof

---

[20] "[T]he 'exception' for the 'affirmative defense' is somewhat ambiguous. If in fact section 3(1) makes an exception from the common law rule that the burden of establishing such a defense is on its proponent, it fails to state what rule shall govern. Accordingly, an assumption must be made that no 'exception' is in fact created." Thibodeau, *Michigan's Environmental Protection Act of 1970: Panacea or Pandora's Box,* 48 Journal of Urban Law 579, 584, fn 16 (1971).

not on a citizenry largely unschooled in the intricacies of environmental technology, but on a defendant who "has the underlying data and documentation upon which his choice of a given course of action is based". Pierce, Sax and Irwin, *Responses to "Thoughts on H. B. 3055"*, at 4, March 20, 1970 (unpublished manuscript in the files of Professor Sax, University of Michigan Law School), quoted in Note, *Michigan Environmental Protection Act: Political Background*, 4 U Mich J L Ref 358, 367 fn 36 (1970). Thus we hold that a defendant asserting the statutory affirmative defense of § 3(1) of the EPA has the burden of proving same by a preponderance of the evidence.

In the present case, defendant alleges the trial court mistakenly concluded that defendant had failed to establish its affirmative defense. On reflection, we side with the trial judge.

The testimony of Dr. Warner described three examples of "known technology" which offer "solutions to odor abatement". Moreover, defense witness Eggers acknowledged that certain companies offered to reduce Olsonite's odorous emissions by 95 to 97 percent; indeed one company, contrary to Eggers' testimony, offered Olsonite a thermal oxidation system backed by "an odor free guarantee [that] can be made * * * without any extensive tests".

But defendant wants more. It asks the Division to recommend a system guaranteed to eliminate all citizen complaints. This position expects more than reality can offer and it forgets that one sense of the word feasible comprehends an approach which "is *likely* to work out or be put into effect successfully".[21]

---

[21] *Webster's Third International Dictionary,* p 1771 (1965), distinguishing "feasible" from "possible" and "practicable". (Emphasis added.) *See also, id.,* at 831, "feasible", definition 3.

The Division clearly does not expect perfection; rather, it requires defendant to keep its emitted fumes to a "practical minimum". *Crandall v Biergans,* Clinton County Circuit Court No. 844, 3 ERC 1827 (1972). As we have found, defendant has not succeeded in minimizing its odors. Relying almost exclusively on an undependable water curtain, Olsonite has done little more than make preliminary inquiries which ceased as soon as it encountered obstacles *seemingly* preventing adoption of an alternative odor-abatement program. As noted, Olsonite never sought a reduction in the quoted cost of these systems, never ascertained whether less expensive abatement techniques might be used on its less egregious emission sources and never instituted pilot studies or commissioned engineering drawings. Thus, we are convinced that the lower court did not clearly err—indeed did not err at all—in finding the technical feasibility of alternative controls on odor.

With respect to the economic feasibility of alternative pollution controls, we adopt the test employed in an analogous setting under the Occupational Safety and Health Act of 1970, 29 USC 651 *et seq.* (OSHA). See *Industrial Union Department, AFL-CIO v Hodgson,* 162 US App DC 331; 499 F2d 467 (1974).

In *Hodgson,* the Court of Appeals for the District of Columbia Circuit, interpreting the term "feasible" as used in § 655(b)(5)[22] of OSHA, observed:

"There can be no question that OSHA represents a decision to require safeguards for the health of em-

---

[22] "The Secretary * * * shall set the standard which most adequately assures, *to the extent feasible,* on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity * * * ." (Emphasis added.)

ployees even if such measures substantially increase production costs. This is not, however, the same thing as saying that Congress intended to require immediate implementation of all protective measures technologically achievable without regard for their economic impact. To the contrary, it would comport with common usage to say that a standard that is prohibitively expensive is not 'feasible.'

\* \* \*

"[P]ractical considerations can temper protective requirements. Congress does not appear to have intended to protect employees by putting their employers out of business—either by requiring protective devices unavailable under existing technology or by making financial viability generally impossible.

"This qualification is not intended to provide a route by which recalcitrant employers or industries may avoid the reforms contemplated by the Act. *Standards may be economically feasible even though, from the standpoint of employers, they are financially burdensome and affect profit margins adversely. Nor does the concept of economic feasibility necessarily guarantee the continued existence of individual employers. It would appear to be consistent with the purposes of the Act to envisage the economic demise of an employer who has lagged behind the rest of the industry in protecting the health and safety of employees and is consequently financially unable to comply with new standards as quickly as other employers.*" 499 F2d at 477–478. (Footnotes omitted. Emphasis added.)

Accord: *United States v Reserve Mining Company,* 380 F Supp 11 (DC Minn, 1974), applying the above interpretation to the Minnesota Environmental Rights Act, a statute modeled generally after Michigan's EPA.

Concerning the requirement that the alternative to a polluter's conduct be "prudent", we approve of the interpretation advanced in *Citizens to Preserve Overton Park, Inc v Volpe,* 401 US 402; 91 S Ct 814; 28 L Ed 2d 136 (1971). There the Supreme

Court examined the term "prudent alternative" in § 4(f) of the Department of Transportation Act of 1966, 49 USC 1653(f), and in § 18(a) of the Federal Aid Highway Act of 1968, 23 USC 138, which prohibit the Secretary of Transportation from authorizing the use of Federal funds to finance highway construction through public parks if a "feasible and prudent alternative" route exists. In unequivocal language, the Court rejected the contention that the phrase "prudent alternative" requires a comprehensive balancing of competing interests:

"[N]o such wide-ranging endeavor was intended. It is obvious that in most cases considerations of cost, directness of route, and community disruption will indicate that parkland should be used for highway construction whenever possible.

\* \* \*

"Congress clearly did not intend that cost and disruption of the community were to be ignored by the Secretary. But the very existence of the statutes indicates that protection of parkland was to be given *paramount importance.* The few green havens that are public parks were not to be lost unless there were *truly unusual factors* present in a particular case or the cost of community disruption resulting from alternative routes reached *extraordinary magnitudes.* If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems." 401 US at 411; 91 S Ct at 821; 28 L Ed 2d at 151. (Emphasis supplied.)

Similarly, see *County of Freeborn v Bryson,* — Minn —; 243 NW2d 316, 318 (1976).

This interpretation of "prudent alternative" is bolstered by recognition that the Legislature rejected an amendment which would have inserted the phrase, "considering all relevant surrounding circumstances and factors" before the "feasible and prudent" language of § 3(1). See, Note, *Michi-*

*gan's Environmental Protection Act: Political Background,* 4 U Mich J L Ref 358, 363 (1970), and Thibodeau, *Michigan's Environmental Protection Act of 1970: Panacea or Pandora's Box,* 48 Journal of Urban Law 579, 586 (1971).

Applying the cited cases to the facts at hand, we conclude that the defendant has failed to show the technical, economic infeasibility and the imprudence of alternatives to defendant's conduct. Although the adoption of additional pollution controls may financially burden Olsonite and adversely affect its profit margin, *Hodgson, supra,* we believe, in light of the revenue data noted, *supra,* that the company is fully able to finance the added cost of restraining odorous emissions. The costs involved do not approach "extraordinary magnitude" and no "truly unusual factors", *Overton Park, supra,* refute the demonstrated prudence of alternative systems. We believe that a reasonable, cost-effective solution to Olsonite's odor problem can be achieved if an earnest examination of other abatement methods is made. Defendant's conduct, then, will no longer be inconsistent with the promotion of public health, safety and welfare in light of Michigan's paramount concern for the natural resources of the state.

In its final claim of error, Olsonite decries as too drastic the injunctive relief ordered by the trial court and asserts that the judge erred in failing to recognize and exercise his discretion before issuing an injunction.

We disagree.

The trial court's decree has been narrowly drafted. It awards relief to plaintiff while permitting defendant a reasonable time to comply and affording it an opportunity for further hearing. Although the court expressed the need for injunction in mandatory terms, we are certain the

learned judge, having studiously followed the commands of *Ray, supra,* clearly understood that the granting of equitable relief is a discretionary decision under MCLA 691.1204(1); MSA 14.528(204)(1). *Ray, supra* at 305.

Accordingly, the trial court is directed to conduct, as soon as practicable, a new hearing consistent with the requirements of MCLA 691.1202(2); MSA 14.528(202)(2), as outlined previously. In its discretion, the court may then 1) specify an appropriate standard (which may be the same, more strict or possibly, but improbably, less strict than that previously approved) governing odor emissions, 2) incorporate the chosen standard into its decree, and 3) set new compliance dates for the selection, installation and completion of a specific *supplemental* odor control system ultimately selected by defendant.

In the meantime, defendant is ordered to begin forthwith at its own expense the comprehensive examination of alternative odor restraints that should have occurred months and years ago. This effort shall be monitored by knowledgeable representatives of plaintiff and both parties shall prepare reports for submission to the trial court on a date set by that court. This date may be the same or different than the hearing date above. GCR 1963, 820.1(7).

Nothing in the foregoing order shall prevent defendant from seeking to further improve the efficiency of its water curtain or to investigate paint spray applicators which reduce the amount of paint or solvents utilized in its painting process.[23]

Affirmed in part and remanded for proceedings consistent with this opinion.

No costs, a public question being involved.

---

[23] We suspect that improvements in water-curtain efficiency and paint-spray application may well reduce the total volume of odor to

be restrained by supplemental controls. This should appreciably lower the cost of such controls.

Moreover, we anticipate (without so holding given the inexact financial data, fn 12, *supra)* that a good faith effort will uncover other cost savings which should obviate the need for employee dismissals.