CIPRI v BELLINGHAM FROZEN FOODS, INC

Docket No. 197678. Submitted January 12, 1999, at Grand Rapids. Decided April 6, 1999, at 9:00 A.M. Leave to appeal sought.

Richard J. Cipri brought an action in the Van Buren Circuit Court against Bellingham Frozen Foods, Inc., and others, seeking damages and other relief with regard to claims of negligence, trespass, nuisance, and violations of the Michigan Environmental Protection Act (MEPA), MCL 691.1201 et seq.; MSA 14.528(201) et seq., now part of the Natural Resources and Michigan Environmental Protection Act (NREPA) at MCL 324.1701 et seq.; MSA 13A.1701 et seq., and the Environmental Response Act (MERA), MCL 299.601 et seq.; MSA 13.32(1) et seq., now part of the NREPA at MCL 324.20101 et seq.; MSA 13A.20101 et seq., with respect to leachate from sweet corn silage that flowed into his private lake and killed aquatic life. The court, William C. Buhl, J., summarily dismissed the MERA claim against Bellingham, ruling that the cornhusks sold by Bellingham to defendant Bernard C. Sherburn, Jr., were not a hazardous substance within the meaning of the MERA. The plaintiff appealed by leave granted. The Court of Appeals, DOCTOROFF, C.J., and NEFF and CONNOR, JJ., reversed and remanded, holding that the definition of "hazardous substance" that controls in this case is that which was provided in the MERA, not the NREPA, and that the cornhusks in question fit the MERA definition of "chemical or other material which is or may become injurious to the public health, safety, or welfare or to the environment." 213 Mich App 32 (1995). On remand, a jury awarded compensatory damages with regard to the claims of negligence, and nuisance, and the court granted a judgment for the defendants with regard to the plaintiff's claims for equitable relief under the MEPA and for damages under the MERA. The plaintiff appealed, and Bellingham cross appealed.

The Court of Appeals held:

1. The trial court did not abuse its discretion in denying equitable relief under the MEPA in the form of restoration of the lake. The trial court did not clearly err in finding the proposed restoration efforts questionable in light of expert testimony indicating that the lake and the aquatic life therein would recover on their own.

2. The trial court, in granting Bellingham's motion for summary disposition of the MERA claim for damages, clearly erred in finding that Bellingham was not a responsible party because it did not arrange for the disposal of the cornhusks. The relevant inquiry concerning arranger liability is whether the party intended to enter into a transaction that included an arrangement for the disposal of hazardous substances. In this case, the trial court found that Bellingham intended to dispose of the cornhusks, but concluded that no liability should be imposed on Bellingham because it effectively undertook a recycling effort. Such a conclusion was wrong inasmuch as strict liability attached under the MERA once the trial court found that Bellingham intended to dispose of the cornhusks. This case need not be remanded for reassessment of damages because the advisory verdict rendered by the jury does not support a further award of damages.

3. The trial court did not err in denying Bellingham's motions for a directed verdict and for judgment notwithstanding the verdict with regard to the plaintiff's negligence claim. Contrary to Bellingham's contention, Bellingham owed an actionable duty to the plaintiff. The fact that a defendant's conduct may have been in violation of a statute does not in and of itself shed light on whether the defendant owed the plaintiff a duty of care; however, once a duty is found, the violation of a statute can be prima facie evidence of negligence. Whether a plaintiff can use a statute to impose a duty of care on a defendant depends on whether the purpose of the statute was to prevent the type of injury and harm actually suffered and whether the plaintiff was within the class of persons that the statute was designed to protect. The MERA and the MEPA were intended to prevent precisely the type of injury suffered in this case, and the plaintiff was within the class of persons intended to be protected by the statutes.

4. The trial court did not err in refusing to instruct the jury pursuant to a request by Bellingham that defendants Valleyview Farms, Inc., Decaturland Investments, Inc., and Sherburn were sophisticated users of sweet corn silage. Such an instruction was not supported by the evidence at trial.

Affirmed in part and reversed in part.

1. ENVIRONMENT — ENVIRONMENTAL LAWS — EQUITABLE RELIEF — FINDINGS OF FACT — APPEAL.

The Court of Appeals will not overturn a trial court's findings of fact relative to a request for equitable relief pursuant to an environmental protection statute unless the findings are clearly erroneous and will not reverse a trial court's decision to grant or deny such equitable relief unless the trial court abused its discretion.

2. ENVIRONMENT — ENVIRONMENTAL RESPONSE ACT — HAZARDOUS SUBSTANCES — DISPOSAL — ARRANGER LIABILITY.

Arranger liability under the Environmental Response Act arose where a party intended to enter into a transaction that included an arrangement for the disposal of hazardous substances (MCL 299.612[1][d]; MSA 13.32[12][1][d]).

3. NEGLIGENCE — DUTY — VIOLATIONS OF STATUTES.

Whether a plaintiff can use a statute to impose a duty of care on a defendant depends on whether the purpose of the statute was to prevent the type of injury and harm actually suffered and whether the plaintiff was within the class of persons that the statute was designed to protect.

*Reed, Stover & O'Connor, P.C.* (by *Michael B. Ortega* and *Patricia R. Mason*), for Richard J. Cipri.

*Howard & Howard Attorneys, P.C.* (by *Steven C. Kohl* and *Charles E. Dunn*), for Bellingham Frozen Foods, Inc.

*Varnum, Riddering, Schmidt & Howlett, LLP* (by *Michael S. McElwee*), for Decaturland Investments, Inc.

Before: HOOD, P.J., and NEFF and MARKEY, JJ.

PER CURIAM. This is an environmental law case arising from injuries to a lake that resulted from the discharge of sweet corn silage leachate.[1] The pertinent facts are set out in *Cipri v Bellingham Frozen Foods, Inc*, 213 Mich App 32; 539 NW2d 526 (1995), and will not be repeated here. In *Cipri*, we reversed the trial court's grant of partial summary disposition to

---

[1] The by-products of Bellingham's sweet corn processing operation were provided to defendant Valleyview Farms, Inc., to be used as cattle feed. "Silage" is created when these by-products are fermented inside a silo for longer storage. "Leachate" is the liquid that emanates from the silage during fermentation. Decaturland Investments, Inc., owns Valleyview, which is operated by its former owner, defendant Bernard C. Sherburn, Jr.

defendants. A jury trial was held upon remand and plaintiff was awarded $90,000 in compensatory damages, on his negligence claim against Bellingham and on his nuisance claim against Decaturland Investments, Inc. However, the trial court granted judgment to defendants with regard to plaintiff's statutory claims. Plaintiff appeals as of right; defendant Bellingham cross appeals. We affirm in part and reverse in part.

We first provide a brief overview of the now-superseded[2] environmental statutes under which plaintiff is proceeding.

In pertinent part, the former Michigan Environmental Protection Act (MEPA) provided for "declaratory and equitable relief against . . . any person . . . for the protection of the air, water and other natural resources and the public trust therein from pollution, impairment or destruction." MCL 691.1202(1); MSA 14.528(202)(1). "To determine whether the plaintiff has established a prima facie claim under the MEPA,

---

[2] The Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et. seq.*; MSA 13A.101 *et seq.*, became effective on March 30, 1995. 1994 PA 451. It repealed several statutes, including the prior Michigan Environmental Protection Act (MEPA) and the Michigan Environmental Response Act (MERA), both of which are involved in this case. These are now the Michigan Environmental Protection Act (MEPA), MCL 324.1701 *et seq.*; MSA 13A.1701 et seq., and the remediation act, MCL 324.20101 *et seq.*; MSA 13A.20101 *et seq.* However, MCL 324.102; MSA 13A.102, provided:

> The repeal of any statute by this act does not relinquish any penalty, forfeiture or liability, whether criminal or civil in nature, and such statute shall be treated as still remaining in force as necessary for the purpose of instituting or sustaining any proper action or prosecution for the enforcement of the penalty, forfeiture, or liability.

Therefore, this case is governed by the provisions that were in effect at the time of the events.

the court must determine whether the challenged action by the defendant rises to the level of an impairment or destruction of a natural resource so as to constitute an environmental risk and justify judicial intervention." *Wortelboer v Benzie Co*, 212 Mich App 208, 220; 537 NW2d 603 (1995). Plaintiff must show "that the conduct of the defendant has, or is likely to pollute, impair or destroy the air, water or other natural resources or the public trust therein . . . ." MCL 691.1203(1);   MSA 14.528(203)(1). "The court *may* [then] grant temporary and permanent equitable relief, or may impose conditions on the defendant that are *required* to protect the air, water and other natural resources or the public trust therein from pollution, impairment or destruction." MCL 691.1204(1); MSA 14.528(204) (emphasis added). Thus, where impairment or destruction of a natural resource is found, "[r]estoration of the natural habitat is a proper remedy under the [M]EPA." *Stevens v Creek*, 121 Mich App 503, 508; 328 NW2d 672 (1982);  see also *Eyde v Michigan*, 82 Mich App 531, 538-540; 267 NW2d 442 (1978).

On the other hand, the former Michigan Environmental Response Act (MERA) provides a cause of action for compensatory damages. See MCL 299.612(2); MSA 13.32(12)(2). Like its federal counterpart,[3] the MERA imposes liability where there has been (1) a release of a hazardous substance, (2) at a facility, (3) causing plaintiff to incur response costs, and (4) defendant is a responsible party. MCL 299.612(1), (2)(b); MSA 13.32(12)(1), (2)(b); *Farm Bureau Mut*

---

[3] The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 USC 9601 *et seq.*

*Ins Co v Porter & Heckman, Inc*, 220 Mich App 627, 637, 639-641; 560 NW2d 367 (1996); see also *Pitsch v ESE Michigan, Inc*, 233 Mich App 578; 593 NW2d 565 (1999) (squarely holding that subsection (2)(b) creates a private cause of action for damages). Responsible parties include the owner of the facility, its operator, a person who arranged for disposal or treatment of a hazardous substance, and a person who accepts such a substance for transportation to a facility. MCL 299.612(1); MSA 13.32(12)(1); see also *Farm Bureau, supra* at 641-642.

Under the MERA, a private plaintiff may recover response activity costs and compensatory damages. MCL 299.612(2)(a), (c); MSA 13.32(12)(2)(a), (c). At the time of the initial leakage in this case, the statute defined response activity as

> an activity *necessary* to protect public health, safety, welfare, and the environment, and includes but is not limited to, evaluation, cleanup, removal, containment, isolation, treatment, monitoring, maintenance, replacement of water supplies, temporary relocation of people as determined to be necessary by the governor or the governor's designee, and reimbursement for certain expenses as provided for in section 11. [MCL 299.603(j); MSA 13.32(3)(j), as amended by 1984 PA 388 (emphasis added).[4]]

---

[4] Effective July 1, 1991, the definition of response activity became

> evaluation, interim response activity, remedial action, or the taking of other actions necessary to protect the public health, safety, or welfare, or the environment, or the natural resources. Response activity also includes health assessments or health effect studies carried out under the supervision, or with the approval of, the department of public health, and enforcement actions related to any response activity. [MCL 299.603(aa); MSA 13.32(3)(aa).]

Under the 1991 version of the statute,

Under the MERA, therefore, a private party may recover "those response activity costs that are 'required' in remediating a contaminated site . . . ." *Port Huron v Amoco Oil Co, Inc*, 229 Mich App 616, 629; 583 NW2d 215 (1998).[5] Compensatory damages may also be awarded "for the full value of injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing the injury, destruction, or loss resulting from the release." MCL 299.612(2)(c); MSA 13.32(12)(2)(c).

In *Cipri, supra* at 41-43, this Court determined that the sweet corn by-products were a "hazardous substance" under the MERA because they could and did become injurious to the environment.[6] On remand,

---

"[r]emedial action" includes, but is not limited to, cleanup, removal, containment, isolation, destruction, or treatment of a hazardous substance released or threatened to be released into the environment, monitoring, maintenance, or the taking of other actions that may be necessary to prevent, minimize, or mitigate injury to the public health, safety, or welfare, or to the environment. [MCL 299.603(y); MSA 13.32(3)(y).]

[5] Because the response activity at issue in this case occurred after the promulgation of new administrative rules under the act, July 12, 1990,

recovery of cleanup costs incurred by a private party is governed by the standard set forth in [MCL 299.612(2)(b); MSA 13.32(12)(2)(b)], which subjects a [potentially responsible person] to liability for "[a]ny other necessary costs of response activity incurred" by a private party that is "consistent with the rules relating to the selection and implementation of response activity promulgated under this act." [*Port Huron, supra* at 628.]

Under the 1990 rules, plaintiff need not prove that costs were "reasonably" incurred. *Id.* at 629. Additionally, although a private party must also show that " 'its necessary costs of response activity' were incurred consistent[ly] with the MDNR rules," such rules are "permissive, not mandatory," and therefore a party need not show "that it performed a remedial investigation, a remedial action plan, or a feasibility study if the MDNR does not require them." *Id.* at 630-633.

[6] The MERA now specifically excludes "fruit, vegetable, or field crop residuals or processing by-products, or aquatic plants, that are applied to

the jury found that the sweet corn leachate had polluted the lake and killed its fish, and awarded tort damages. The statutory MEPA and MERA claims were then decided by the court. After a hearing, the trial court declined to order equitable relief under the MEPA because it found that: (1) the need for restoring Baker Lake, beyond what time and nature would do, had not been established; (2) the effectiveness of the proposed restoration efforts were questionable in view of the experts' testimony; and (3) the jury's verdict, taken as advisory on the statutory claims, did not support a factual finding of long-term damage to the lake. With respect to the MERA claim for damages, the trial court decided that defendant Bellingham was not a responsible party under the statute.

We now turn to the specific issues raised on appeal. Initially, plaintiff argues that the trial court erred in refusing to order defendants to restore the lake. We disagree.

The interpretation of Michigan's environmental legislation is a question of law that we review de novo. *Port Huron, supra* at 624 (MERA); see also *Trout Unlimited, Muskegon-White River Chapter v White Cloud (After Remand)*, 209 Mich App 452, 456; 532 NW2d 192 (1995) (MEPA). On the other hand, this Court will not overturn a trial court's findings of fact unless they are clearly erroneous or unless we are convinced that we would have reached a different

---

the land for an agricultural use or for use as an animal feed, if the use is consistent with generally accepted agricultural management practices, developed pursuant to the Michigan right to farm act . . . ." MCL 324.20101(1)(t); MSA 13A.20101(1)(t). However, the act provides that any judicial action initiated on or before May 1, 1995, shall be governed by provisions that were in effect at that time. MCL 324.20102a(1)(a); MSA 13A.20102a(1)(a).

result. *Port Huron, supra* at 636; *Trout Unlimited, supra* at 456. A finding is clearly erroneous when, although there is evidence to support it, this Court is left with the definite and firm conviction that a mistake has been made. *Port Huron, supra* at 636; *Trout Unlimited, supra* at 456. Lastly, equitable issues are reviewed de novo, although the findings of fact supporting the decision are reviewed for clear error. *Webb v Smith (After Remand)*, 204 Mich App 564, 568; 516 NW2d 124 (1994). However, "[t]he granting of injunctive relief is within the sound discretion of the trial court, although the decision must not be arbitrary and must be based on the facts of the particular case." *Holly Twp v Dep't of Natural Resources*, 440 Mich 891 (1992); see also *Wayne Co Dep't of Health v Olsonite Corp*, 79 Mich App 668, 699-700, 706-707; 263 NW2d 778 (1977).

We first decline to overturn the trial court's findings of fact under the MEPA because we cannot conclude that they are clearly erroneous or that we would have reached a different result. *Trout Unlimited, supra* at 456. Considerable evidence supported the conclusion that the lake was recovering naturally and therefore restoration was not "required" under the MEPA. Plaintiff's expert testified that the lake now supports fish life and poses no threat to safety. He further agreed that deposits of organic sedimentation that create high oxygen demands occur naturally in all lakes. Eventually, those organic materials decompose and oxygen levels rise. Most importantly, plaintiff's expert could not estimate the quantitative effects that his proposed $250,000 restoration program would have on the oxygen level or the fish population of the lake, and he admitted that the plan was still being tested.

Thus, the testimony supported the trial court's conclusion that the effectiveness of plaintiff's proposed restoration efforts was questionable. We also agree with the trial court that, because all claimed items of damages were submitted to the jury, the jury's award of only $90,000—taken as advisory, MCR 2.509(D) — is not supportive of a factual finding of long-term damage to the lake.[7] Accordingly, the trial court did not abuse its discretion in denying plaintiff's claim for equitable relief under the MEPA.

Next, plaintiff claims that the trial court erred in granting defendant Bellingham's motion for summary disposition of plaintiff's MERA claim for damages on the grounds that Bellingham was not liable as a responsible party because it did not "arrange" for the disposal or treatment of a hazardous substance. See MCL 299.612(1)(d); MSA 13.32(12)(1)(d). We agree.

*Farm Bureau, supra* at 629-631, is the only published case discussing the "sale of a useful product" defense to a claim of "arranger" liability under the MERA. That case involved a plumbing and heating repair business that allegedly failed to detect a leak in the filter unit of an outdoor home heating oil tank, leading to soil contamination. This Court agreed with the trial court that "the record [wa]s devoid of evidence tending to show that defendant intended to dispose of the heating oil" and, therefore, defendant did not incur "arranger" liability. *Id.* at 661. The Court noted that the defendant had no "authority to control the handling or disposal of the hazardous substance

---

[7] The $90,000 jury award is large enough to account for all of plaintiff's claimed items of damages ($27,187.70 + $18,702.53 + $31,075 + $10,950), except for the amount requested for the proposed restoration program ($260,019).

. . . ." *Id.* at 656. We add, however, that the defendant in *Farm Bureau* had no authority to dispose of the oil at all because it was hired only to service the furnace and the oil tank. See *id.* at 630-633, 658-659. Thus, we believe that the case should not be read to require that, in order to impose arranger liability, a defendant must be found to have authority to control *how* the disposal of a hazardous substance is carried out.

Under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 USC 9601 *et seq.*, the MERA's federal counterpart, "arranger" "[l]iability only attaches to parties that have 'taken an affirmative act to dispose of a hazardous substance . . . as opposed to convey[ing] a useful substance for a useful purpose.'" *AM Int'l, Inc v Int'l Forging Equipment Corp*, 982 F2d 989, 999 (CA 6, 1993). Thus, manufacturers who send materials to reclaiming facilities incur "arranger" liability—even though a useful product is ultimately extracted—while suppliers of dangerous raw materials do not. *Id.*; compare *Edward Hines Lumber Co v Vulcan Materials Co*, 861 F2d 155, 156-159 (CA 7, 1988) (vendor of toxic chemicals not liable), with *Catellus Development Corp v United States*, 34 F3d 748, 752-753 (CA 9, 1994) (manufacturer who supplied used batteries to reclaiming facility was liable).

"Disposal" under the CERCLA "is deemed to take place only at the point at which there is a *threat* that hazardous wastes will be emitted into the environment, air, soil, or groundwater." *AM Int'l, supra* at 998 (emphasis added). Thus, in deciding a claim of arranger liability under the CERCLA, "the requisite inquiry is whether the party intended to enter into a

transaction that included an 'arrangement for' the disposal of hazardous substances." *United States v Cello-Foil Products, Inc*, 100 F3d 1227, 1231 (CA 6, 1996); see also *AM Int'l, supra* at 999. Once this intent is found, an arranger is held strictly liable "even when it has no control over the process leading to the release of substances." *Cello-Foil, supra* at 1232. Thus, an arranger "cannot escape liability by claiming that it had no intent to have the waste disposed [of] in a particular manner or at a particular site." *Id.*

Intent to dispose is a question of fact that we review for clear error. *Id.* at 1233; *Port Huron, supra* at 636. Intent "need not be proven by direct evidence, but can be inferred from the totality of the circumstances." *Cello-Foil, supra* at 1231. "Frequently, the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds." *Id.* at 1233 (quoting *Washington v Davis*, 426 US 229, 253; 96 S Ct 2040; 48 L Ed 2d 597 [1976]). It should also be remembered that our Legislature intended for the MERA to be "more responsive to environmental contamination than . . . its federal counterpart . . . ." *Port Huron, supra* at 632. The MERA therefore allows "a private party greater flexibility in recovering its cleanup costs from a responsible party." *Port Huron, supra* at 633.

In this case, the trial court found that the sweet corn by-products were useful as cattle feed in their normal state and that the by-products were fermented in silos as a method of preservation only (the product

is then called silage). The court acknowledged that defendant Bellingham did not want and did not have a use for these by-products: "[T]o them it is a waste. They don't have any use for it, it is something that they have to dispose of . . . ." However, the court declined to "determine the outcome of this by asking whether or not Bellingham intended to get rid of a waste. That is too simple." Instead, the court inferred Bellingham's intent from its long uneventful history of selling corn by-products as cattle feed in the state of Washington. The court also noted that "done properly . . . it is better to have a product used in another way that is useful than to cover it up in a landfill." The court therefore concluded that Bellingham intended that the by-products be put to good use rather than to dispose of them, and declined to impose arranger liability under the MERA.

As in *Farm Bureau* and *Cello-Foil*, we find that the trial court basically identified the correct test, but erred in how it applied it to the facts of this case. We note that the agreement between Bellingham and Valleyview provided that Valleyview would have exclusive rights to the corn by-product "at no cost," other than being responsible for hauling it away. The trial court recognized that Bellingham did not want the by-product, that it had no use for it and that, to Bellingham, the by-products were a waste that it had to "dispose of." Although we agree that recycling is a goal to be encouraged, we must enforce the statute as written.[8] Once the trial court found that Bellingham intended to dispose of the sweet corn by-product,

---

[8] "[I]t is not our role to make policy determinations. Arguments that a statute is unwise or results in bad policy should be addressed to the Legislature." *Cipri, supra* at 42-43.

strict liability attached under the MERA, and the trial court's inquiry should have stopped. We find that the trial court clearly erred in finding that Bellingham was not a responsible party under the MERA and therefore reverse with regard to that claim. However, because we agree with the trial court that the jury's verdict, taken as advisory under MCR 2.509(D), does not support an award of damages greater than those already awarded by the jury, we decline to remand the case for a reassessment of damages.

Next, on cross appeal, defendant Bellingham contends that it had no duty of care toward plaintiff and that the trial court therefore erred in denying its motions for a directed verdict and for judgment notwithstanding the verdict (JNOV) with regard to plaintiff's negligence claim. We disagree.

"The issue whether a defendant owes an actionable legal duty to a plaintiff is a question of law [to be reviewed de novo] that the court must decide after assessing the competing policy considerations for and against recognizing the asserted duty." *Colangelo v Tau Kappa Epsilon Fraternity*, 205 Mich App 129, 132; 517 NW2d 289 (1994). A motion for a directed verdict or for JNOV should be granted only when, viewing the evidence and all legitimate inferences in the light most favorable to the nonmoving party, there are no issues of material fact with regard to which reasonable minds could differ. *Matras v Amoco Oil Co*, 424 Mich 675, 681-682; 385 NW2d 586 (1986).

> In determining whether a duty exists, courts look to different variables, including the (1) foreseeability of the harm, (2) degree of certainty of injury, (3) existence of a relationship between the parties involved, (4) closeness of connection between the conduct and injury, (5) moral

blame attached to the conduct, (6) policy of preventing future harm, and (7) the burdens and consequences of imposing a duty and the resulting liability for breach. [*Terry v Detroit*, 226 Mich App 418, 424; 573 NW2d 348 (1997).]

"The mere fact that an event may be foreseeable is insufficient to impose a duty upon the defendant"; rather, the question is whether, in light of all the relevant evidence, "the defendant is under any obligation for the benefit of the particular plaintiff . . . ." *Terry, supra* at 424-425 (quoting *Buczkowski v McKay*, 441 Mich 96, 100-101; 490 NW2d 330 [1992]); see also *Moning v Alfono*, 400 Mich 425, 437-439; 254 NW2d 759 (1977). Whether defendant acted with reasonable care is the standard for liability, not the test for determining whether a duty exists. *Buczkowski, supra* at 100.

A duty of care

may arise specifically by mandate of statute, or it may arise generally by operation of law under application of the basic rule of the common law, which imposes on every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his action as not to unreasonably endanger the person or property of others. [*Clark v Dalman*, 379 Mich 251, 261; 150 NW2d 755 (1967).]

"Such duty of care may be a specific duty owing to the plaintiff by the defendant, or it may be a general one owed by the defendant to the public, of which the plaintiff is a part." *Id.* (contractor owed duty of care to everyone lawfully on the job site); see, e.g., *Hetterle v Chido*, 155 Mich App 582, 588-590; 400 NW2d 324 (1986) (passenger owed duty of care to general public to refrain from interfering with driver's operation of motor vehicle).

However, the fact that a defendant's conduct may have been in violation of a statute does not in and of itself shed light on whether a defendant owed a plaintiff a duty of care; however, once a duty is found, the violation of a statute can be prima facie evidence of negligence. See, e.g., *Beals v Walker*, 416 Mich 469, 481-482; 331 NW2d 700 (1982) (workplace safety regulations); *Ward v Frank's Nursery & Crafts, Inc*, 186 Mich App 120, 135; 463 NW2d 442 (1990) (city ordinance); *Carney v Dep't of Transportation*, 145 Mich App 690, 699-700; 378 NW2d 574 (1985) (standards for highway design). Rather, whether a plaintiff can use a statute to impose a duty of care on a defendant depends on (1) whether "the purpose of the [statute] was to prevent the type of injury and harm actually suffered" and (2) whether the plaintiff was "within the class of persons which [the statute] was designed to protect." *McKnight v Carter*, 144 Mich App 623, 636; 376 NW2d 170 (1985); see also *Phillips v Deihm*, 213 Mich App 389, 396-398; 541 NW2d 566 (1995) (grandmother with whom child-plaintiff resided had a statutory duty to prevent sexual abuse by grandfather).

There are no published cases discussing whether the MERA or the MEPA imposes a duty of care, actionable in tort, on the general public. We note initially that the purpose of the statutes is to prevent environmental contamination and to promote compensation for remediation and that liability flows from anyone fitting the definition of a responsible party to any member of the public who incurs response costs or whose natural resources are injured by such contamination. We therefore conclude that the statutes were intended to prevent precisely this type of injury and

that plaintiff was within the class of persons intended to be protected by the statutes.

With respect to the traditional variables that define a duty, the record shows that defendant Bellingham never informed anyone at Valleyview Farms, Inc., that sweet corn leachate could be hazardous to the environment. The record indicates that Bellingham was knowledgeable about the dangers of sweet corn leachate from working with the Department of Natural Resources (DNR) and complying with DNR standards for controlling and disposing of the water runoff from corn processing. Bellingham was adding considerable water to the corn during processing; it saw liquid pouring out of the trucks that were being used to haul the by-product away; it also knew that Valleyview's silo leaked and that the farm was situated on a hill; and it knew that Sherburn was complaining about the amount of water in the by-products and about the difficulty of loading them into the silo. Further, Bellingham knew that Valleyview had no experience with sweet corn silage. Thus, not only was an injury to the environment foreseeable, but the degree of certainty that an injury would happen was relatively high. We further find a close connection between Bellingham's failure to disclose the hazards of improperly storing sweet corn silage and the resulting injury to plaintiff's lake. On the other hand, we acknowledge that there was no prior relationship between plaintiff and Bellingham.

We also find that Bellingham was sufficiently blameworthy. The fact that Bellingham held a special meeting with farmers to introduce them to the availability and benefits of sweet corn silage supports the conclusion that Bellingham knew that the local farm-

ers were not familiar with using sweet corn by-products as silage for livestock, yet did not alert them about the environmental hazards that could result from its improper storage. As the source of the by-product, Bellingham should have had a policy in place to minimize the danger of harm to the environment. Finally, we believe that the burdens and consequences of imposing a duty on Bellingham are no harsher than the liability already imposed on it by the MERA and the MEPA. Thus, we conclude that the trial court did not err in finding that Bellingham had a duty of care toward plaintiff.

Next, Bellingham argues that the trial court erred in refusing to instruct the jury with regard to the sophisticated user doctrine. We disagree.

Jury instructions are reviewed in their entirety to determine whether they "adequately inform the jury [regarding] the applicable law[,] reflecting and reflected by the various evidentiary claims in the particular case." *Riddle v McLouth Steel Products Corp*, 440 Mich 85, 101; 485 NW2d 676 (1992). "When a party requests an instruction that is not covered by the standard jury instructions, the trial court may, in its discretion, give additional, concise, understandable, conversational, and nonargumentative instructions, provided they are applicable and accurately state the law." *Chmielewski v Xermac, Inc*, 216 Mich App 707, 713-714; 550 NW2d 797 (1996), aff'd 457 Mich 593; 580 NW2d 817 (1998); see also MCR 2.516(D)(4).

"[I]t is well-settled that, where a purchaser is a 'sophisticated user' of a manufacturer's product, the purchaser is in the best position to warn the ultimate user of the dangers associated with the product,

thereby relieving the sellers and manufacturers from the duty to warn the ultimate user." *Portelli v I R Constr Products Co, Inc*, 218 Mich App 591, 599; 554 NW2d 591 (1996). Specifically, this Court has stated that

> a duty to warn a purchaser of the inherent dangers of a product does not arise in a situation where the purchaser is a sophisticated user because a sophisticated user is charged with knowledge of the product. The rationale behind the sophisticated-user doctrine is that the manufacturer markets a particular product to a class of professionals that are presumed to be experienced in using and handling the product. Because of this special knowledge, the sophisticated user will be relied upon by the manufacturer to disseminate information to the ultimate users regarding the dangers associated with the product. Hence, the manufacturer is relieved of a duty to warn. [*Id.* at 601.]

For example, manufacturers of scaffolding who affirmatively and successfully market their products to professionals are entitled to assume that their customers know how to use their product and appreciate the dangers of misuse. See, e.g., *Antcliff v State Employees Credit Union*, 414 Mich 624, 639; 327 NW2d 814 (1982); *Rasmussen v Louisville Ladder Co, Inc*, 211 Mich App 541, 545-546; 536 NW2d 221 (1995).

Here, Valleyview Farms, Inc., Decaturland Investments, Inc., and Bernard C. Sherburn, Jr., were clearly experienced farmers. However, there was no evidence that they had any experience with the use and storage of sweet corn silage. Thus, although the silage had dangerous propensities if improperly stored, those dangers were not obvious or known to Valleyview, Decaturland, or Sherburn. Therefore, these

defendants cannot be deemed to have been sophisticated users of that particular product. Rather, Bellingham was the only party who knew about the dangers of improperly storing silage, and thus was the only party who could have disseminated information regarding its potential dangers. The trial court therefore did not err in denying Bellingham's request for a sophisticated user instruction.

Affirmed in part and reversed in part.