*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ROGER E. SULLIVAN,

        Plaintiff/Counterdefendant-Appellant,

v

JOHN T. PEKKALA and TAMI L. PEKKALA,

        Defendants/Counterplaintiffs-
        Appellees.

UNPUBLISHED
July 30, 2020

No. 347435
Houghton Circuit Court
LC No. 2014-016002-CH

Before: BORRELLO, P.J., and SAWYER and SERVITTO, JJ.

PER CURIAM.

In this construction contract dispute, Roger Sullivan appeals as of right the trial court's decision following a bench trial in which the trial court found Sullivan liable for breach of contract and slander of title in addition to dismissing Sullivan's claims against John and Tami Pekkala. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

This case involves a concrete slab that Sullivan poured for the Pekkalas to be part of a structure that the Pekkalas desired to have constructed on their property. Although the Pekkalas refer to this structure as a residential garage, Sullivan characterizes it as a "non-residential structure" that was intended to support an automotive repair shop.

The Pekkalas own three neighboring parcels of property[1] in Houghton County, Michigan, one of which contains their residence. John testified at trial that he and Tami decided to build a garage on this parcel on which their house was located, and he spoke to Steve Ekdahl about the project. Ekdahl did not have time to work on the garage but recommended Sullivan, who is

[1] A road separates one portion of defendant's property, but the portion located across the road from the property on which defendant's residence is located is not at issue in this litigation.

-1-

Ekdahl's son-in-law. Sullivan testified that he is "self employed for Sullivan Contracting, Inc." John, Ekdahl, and Sullivan met at the Pekkalas' house and walked around the site where the garage was to be built. John testified about this meeting as follows:

> Steve [Ekdahl], Roger [Sullivan], and I walked the site, I did the talking. And I cleared beyond the garage site into a low area where I felt that, you know, drainage would be good from the garage to this lower area. So I kind of suggested why don't we put a drain out into that low area, just daylight it out. And then I started asking Steve and Roger, how are we going to set up the drains inside the garage. You know, we got three bays here, we got three garage doors. And I mean, I don't know how drains are set up. Steve's done multiple garages. I don't know anything about Roger's past. Do you put one big drain in the middle, I said, are we going to put four drains on all four corners in the big area of the garage, and two on the far side of the load bearing wall, and then connect all those drains and daylight them out to that back low area. And there was really not a lot of conversation. And like, you know, we got to come up with a plan here, you know, help me out, guys. You guys do this for a living, I don't. And another thing I mentioned is that my son Collin, he got a big truck, and he mentioned hey dad, do you think maybe I can get a lift some day put in there.

John further testified that he never mentioned running a "commercial business" out of the garage, that his son was not a licensed mechanic, and that his son had no intention of becoming an automobile mechanic. John explained that his son belonged to the Keweena Car Club and liked to "tinker" with his truck. John maintained that the garage was intended for personal use.

John testified that during the course of this initial conversation with Ekdahl and Sullivan, he agreed to let Sullivan complete the forming for the concrete slab. John also testified that Sullivan told him that the slab needed to be flat and non-sloping where the lift was going to be installed. John believed that there would be a flat, non-sloping portion of the slab for the lift, with other portions of the slab sloping toward a trench drain in the front portion of the garage. Additionally, based on Sullivan's recommendation, John decided to increase the size of the garage. He then asked Sullivan to obtain an updated supply list and to make sure that trusses were available in the correct size without requiring a custom order. However, John testified that he never hired Sullivan to build the entire garage. He instead only asked Sullivan to complete the forming and to pour the concrete slab, which Sullivan indicated he would pour in multiple sections. John also told Sullivan to obtain the building permit. He testified that he relied on Sullivan's expertise with respect to ensuring that there would be proper drainage for the garage floor. According to John, the arrangement with Sullivan was a "day by day thing" where he would pay Sullivan for his time and materials. John testified that there was no written contract and that the agreement for Sullivan to pour the concrete slab was an oral one.

Sullivan's testimony about the agreement that had been reached was considerably different. Sullivan believed that the structure was intended to be a "repair garage" for the Pekkalas' son and the son would be running an automobile repair business from the garage. Sullivan also believed that he would be building the entire structure once the slab was poured, and he maintained that he never would have agreed to work on a day-by-day basis. According to Sullivan,

Steve Ekdahl was going to pour the concrete and do the block work, masonry work. I was going to help Steve do those because he was working out of town. And then John had hired me upon my initial visit to the site to build the rest of the structure once Steve was done with what he was doing.

Sullivan testified that Ekdahl became unavailable for the project due to other work and asked Sullivan to pour the concrete and complete the work that Ekdahl had originally been planning to perform for the Pekkalas.

Sullivan described the intended design of the floor slab, which Sullivan stated was proposed by Ekdahl and John, as follows:

I was told there's a flat back half of the pour, back half of the slab would be flat. The front half would be split into quarters and each would pitch to a trench drain at the quarter mark.

Sullivan further testified that John told him that he wanted the back half of the garage completely flat and that he would squeegee water into the small drain in that portion since it would be a relatively small area. Although Sullivan's testimony on this point is somewhat unclear, it appears that he maintained that he did not advise John about how to design the slab to accommodate the proposed car lift before the slab was poured. Sullivan stated that John did not have any problem with the plan to have a flat back half of the garage and a sloped front half.

According to Sullivan, he requested a commercial permit when he went to obtain the building permit. He was told to sign and date the application, after which an employee in the building department asked Sullivan questions and filled out the application herself. The building permit application indicates that the application was for a residential detached garage, but Sullivan testified that the building permit that was issued indicated that it was for a storage building. Sullivan maintained that he did not check the box on the permit application indicating that the permit was for a residential structure. Sullivan testified that he did not look up or consult applicable code requirements for commercial buildings or repair garages before he began pouring the slab for the Pekkalas' structure. Sullivan admitted that he was told while he was in the building department office applying for the permit that there was no commercial zoning in the township where the Pekkalas lived and that the project therefore could not be commercial in nature.

Sullivan sent the Pekkalas an invoice related to work he had done to prepare the site for the slab to be poured, and the Pekkalas paid this first invoice. Sullivan then completed pouring the first two portions of cement slab, each on a different day. These portions of slab were for the back half of the garage. Sullivan sent the Pekkalas the second invoice, after which relations between the parties began to deteriorate.

John testified that when he received the second invoice, he was unhappy about the cost of the concrete that Sullivan had billed because Sullivan had charged $30 per cubic yard more than what Sullivan had been charged by the concrete supplier. Although Sullivan told John that this charge was for his "profit," John told Sullivan that he thought Sullivan's profit should be built into his labor rate. Sullivan testified that John was not happy "with the overhead on the concrete" but that John did not express any dissatisfaction with Sullivan's workmanship at that time. Sullivan

further testified that John told him that the cost of the project was running higher than anticipated and that he and Tami wanted to postpone the rest of the project until spring. After John discussed the amount of the second invoice and the cost of the concrete with Sullivan, the Pekkalas never paid the second invoice. Sullivan testified that the Pekkalas refused to pay the invoice because of the issue with the amount he charged for the concrete and not because of any problem with his workmanship.

Sullivan testified that John told him that he did not want a lien placed on his property and that he would pay him once Sullivan paid his vendors. Sullivan did so, but he never received any reimbursement or payment from the Pekkalas. According to Sullivan, he informed the Pekkalas that he would file a construction lien if he did not receive payment, and he only received the first criticisms about his workmanship a few days later. Tami complained to Sullivan that the slab did not slope from back to front and did not drain water. Sullivan responded that the drain did not drain water yet because it was currently taped and that the agreement was for a slab with a flat back half and a sloped front half.

John testified that he inspected the slab more closely around this time and discovered that there were "imperfections" causing the water to collect in "bird baths" on the slab. He went to the county building department and obtained the building code requirements for residential detached garages. According to John, he learned that the entire slab was supposed to be "pitched" or sloped to a drain, and he did not understand why he had been told that this portion of the slab had to be flat when that was contrary to the building code requirements.

Sullivan testified that he also received an e-mail from John in which John indicated that there were multiple depressions in the concrete slab that held standing water, that the entire slab should have been pitched to the front doors or a drain, and that the Pekkalas would not be paying the invoice until their concerns with the slab were addressed. Sullivan replied by again emphasizing that John had wanted the portions of the slab that had already been poured to be flat, and Sullivan indicated that he would take his "next legal action" if he did not receive payment for the second invoice that amounted to $10,866.66. Sullivan did not hear anything from the Pekkalas and subsequently filed a claim of lien against two parcels of their property for $38,444.66. Sullivan explained that he calculated this amount based on "lost profit due to a breach of contract" in addition to the amount of the outstanding invoice. Sullivan's calculations were based on the amount he would have charged to complete the entire garage structure and his claims that he turned down other work during the winter months because he believed this garage project would "take me from the fall right into the spring time of the following year." Sullivan received a letter from the Pekkalas indicating that they would take legal action against him if he did not release the lien. Additionally, John testified that Sullivan never performed any work on one of the parcels even though he filed the lien against both parcels. Sullivan testified that he had a written contract with the Pekkalas based on "multiple emails," the two invoices, the material list and truss drawings, the claim of lien, the notice of filing of lien, and a sworn statement completed by Sullivan.

Sullivan initiated an action to enforce the construction lien through foreclosure. The Pekkalas filed a counterclaim for breach of contract and slander of title. Sullivan's claim of lien was dismissed on a motion for partial summary disposition under MCR 2.116(C)(10), with the trial court ruling that there was no genuine issue of material fact that the garage structure at issue was residential in nature and that there was no written contract between the parties, thus rendering

-4-

Sullivan's claim of lien unenforceable under § 114 of the Construction Lien Act, MCL 570.1101 *et seq.*. At the time of the summary disposition motion hearing, this statute provided that a "contractor does not have a right to a construction lien on the interest of an owner or lessee in a residential structure unless the contractor has provided an improvement to the residential structure pursuant to a written contract between the owner or lessee and the contractor and any amendments or additions to the contract are also in writing." MCL 570.1114, as amended by 2006 PA 497.[2]

The trial court permitted Sullivan to amend his complaint, and Sullivan raised claims of breach of contract, promissory estoppel, unjust enrichment, quantum meriut, fraudulent misrepresentation, innocent misrepresentation, exemplary damages, civil extortion and claim of lien.

The matter proceeded to trial, where John and Sullivan testified as described above. The trial court acknowledged the previous ruling dismissing Sullivan's claim of lien on summary disposition, at which point Sullivan testified that he still had not discharged the lien. Houghton County Building Inspector, Todd LaRoux, additionally testified that cement garage floors were not supposed to be flat and that "code says that in garage floors, you [are] supposed to have positive pitch to a drain, or the main exit door of the vehicle." LaRoux further testified that this requirement also applied to storage facilities for vehicles. LaRoux stated that he inspected the forms for the first portion of the slab that Sullivan was going to pour before the cement was actually poured and that he approved the work that had been completed. Regarding the lack of pitch, LaRoux explained that this was only part of the slab and that the entire floor had not yet been finished. However, after Sullivan poured the second portion of the slab, John contacted LaRoux and asked him to "observ[e] the existing concrete that was poured while he was flooding it." LaRoux testified that he responded to John's request in writing as follows:

> [A]fter flooding a slab with the hose, I observed the following: Number one, a bird bath formed in the second pour approximately six feet in diameter, and approximately three-eights [sic] of an inch deep. Number two, the concrete does not have positive pitch to the drain, very little water flowed to the drain, most of the water flowed to the outside edge of the slab as we continued adding water. This a code violation to the 2009 Michigan Residential Code R-309.1, positive pitch to the drain.

LaRoux clarified that the drain was in the second section of concrete slab that was poured, not the first, and that the water "eventually" made its way to the drain after a significant period of time. The water formed into a "bird bath" and spread from there, tending to flow to the outside edges and other low spots before moving toward the drain.

---

[2] This language is substantively the same in the current version of the statute, which provides: "A contractor does not have a right to a construction lien on the interest of an owner or lessee in a residential structure unless the contractor has provided an improvement to the residential structure under a written contract between the owner or lessee and the contractor and any amendments or additions to the contract are also in writing." MCL 570.1114, as amended by 2016 PA 415.

Although acknowledging that the project had not been completed, LaRoux testified that the portions of slab that had been poured did not have positive pitch to the drain. LaRoux also seemed to contradict himself and testified that he considered the slab to be below industry standards but that the slab could technically satisfy the Houghton County Building Code. However, LaRoux later clarified and resolved this apparent contradiction, stating that there "was no code violation" with respect to Sullivan's decision to pour the slab in multiple pieces rather than as a single slab but that "[i]f you were to just look at the drain that was existing at the time and the way water was to flow, I would have to say it fell under a code violation, a positive pitch to that one drain that was existing." Further, LaRoux explained that it was the first slab portion that had been poured that he believed had technically satisfied the code requirements. LaRoux additionally testified that the depths of the bird baths on the slab were within the permissible deviation and did not constitute technical code violations. According to LaRoux, it was the contractor's responsibility to ensure that the work performed complied with the applicable code requirements.

Additionally, LaRoux indicated that he had installed lifts on pitched floors by shimming the lift. According to LaRoux, adding a lift to a garage did not change it from a residential structure to a commercial structure under the Houghton Building Code. LaRoux testified that stamped engineering drawings are required as part of the permit application process for commercial structures and that no such drawings were submitted with respect to the structure at issue in this case.

Kyle Oja, a general contractor and the president of MJO Contracting, testified that he provided an estimate of $15,530 to the Pekkalas for removing the existing slab that Sullivan had poured and pouring a new slab for the Pekkalas' garage. $1,100 of that cost was related to removing the existing slab.

Following the trial, the trial court issued a written opinion and order finding that Sullivan was liable to the Pekkalas for breach of contract and slander of title, as well as awarding the Pekkalas attorney fees as prevailing parties under the Construction Lien Act, MCL 570.1101 *et seq.*, and dismissing Sullivan's claims against the Pekkalas.

Specifically, the trial court found that the parties had an oral contract for Sullivan to complete the concrete slab of the garage with the potential for Sullivan to be hired to perform additional work on the garage. The trial court also found that Sullivan breached the contract. In this respect, the trial court found that the concrete slab that Sullivan poured violated the Houghton County Building Code because it did not pitch to the drain or main doors and that it was Sullivan's advice that the back portion of the slab should be flat to accommodate a potential lift, which led to him to pour a slab that did not comply with the applicable code requirements. Additionally, the trial court found that the evidence did not support Sullivan's contention that the structure was commercial in nature, pointing specifically to the facts that the building permit was not for a commercial structure and crediting the testimony that John never indicated that the garage was to be for a commercial purpose over Sullivan's testimony to the contrary.

The trial court also found that Sullivan's additional claims of promissory estoppel, unjust enrichment and quantum meruit should be dismissed. The trial court found that Sullivan's claims of fraudulent misrepresentation and innocent misrepresentation should be dismissed because there

-6-

was no evidence introduced of any misrepresentation. Next, the trial court found that Sullivan's claim for exemplary damages should be dismissed because the evidence showed that Sullivan did not suffer any insult, indignity, humiliation, or injury to feelings. The trial court next found that Sullivan's civil extortion claim should be dismissed because this claim was predicated on the Pekkalas' letter requesting that the lien be released, the Pekkalas had a right to make such a request, the trial court had ruled that the lien was to be dismissed as unlawful, and Sullivan thus could not show that the letter constituted a malicious threat. Next, regarding Sullivan's original claim of lien count, the trial court indicated that it took judicial notice of the fact that the claim of lien had already been dismissed and that Sullivan had refused to discharge the lien as of the last day of trial.

Finally, with respect to the Pekkalas' slander of title claim, the trial court found that Sullivan's claim of lien was false because it (1) purported to place a lien on a parcel of the Pekkalas' property on which no work was performed, (2) was for an amount greater than the cost of goods and services that had been provided and there was no agreement between the parties for Sullivan to be paid that amount, and (3) was for an amount that had been calculated by unlawfully including speculative lost profits. The trial court also found that the requisite malice existed, noting particularly that Sullivan had refused to discharge the lien on the Pekkalas' property after it had already been ordered dismissed as the result of an earlier summary disposition motion.

This appeal ensued.

## II. STANDARD OF REVIEW

"This Court reviews a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). "A finding is clearly erroneous if, after a review of the record, this Court is left with a definite and firm conviction that a mistake was made." *Lawrence v Burdi*, 314 Mich App 203, 220; 886 NW2d 748 (2016). Furthermore, "regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it." MCL 2.613(C). "The existence and interpretation of a contract are questions of law reviewed de novo." *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006). "[E]quitable issues are reviewed de novo, although the findings of fact supporting the decision are reviewed for clear error." *Cipri v Bellingham Frozen Foods, Inc*, 235 Mich App 1, 9; 596 NW2d 620 (1999).

## III. ANALYSIS

On appeal, Sullivan argues that the trial court erred by finding in the Pekkalas' favor on their breach of contract and slander of title claims. Sullivan also maintains that the trial court erred by not ruling in his favor on his additional claims.

## A. BREACH OF CONTRACT

We first address Sullivan's breach of contract claim. "A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co v Ahrens Const, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014). "A valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *AFT Mich v Michigan*, 497 Mich 197,

235; 866 NW2d 782 (2015). "The party seeking to enforce a contract bears the burden of proving that the contract exists." *Id*.

In this case, Sullivan disagrees with the trial court's finding that he breached the contract. Specifically, in his brief on appeal, Sullivan argues that the trial court should have made different findings of fact, namely, the trial court should have found that there was a written contract between the parties, that Sullivan had been contracted to build the entire garage structure rather than the slab only, that the garage was actually a commercial structure to which different code requirements applied, that the slabs poured by Sullivan actually satisfied the Houghton Building Code requirements, and that the Pekkalas actually breached the contract. However, his arguments as to what the trial court should have found fail to provide this Court a basis on which to conclude that the trial court clearly erred with respect to any finding of fact as the arguments do not cite any caselaw to demonstrate that the trial court committed any error of law regarding the existence or interpretation of the oral contract.

As previously discussed, there was conflicting evidence on these points for the trial court to resolve. Sullivan's appellate arguments amount to disagreements with how the trial court resolved these conflicts that are based on Sullivan's own interpretations of the evidence and his contention that the trial court gave "disproportionate weight" to "witnesses called by the Pekkalas." Such arguments misconstrue the nature of appellate review of factual findings by the trial court. From his brief it is clear to this Court that Sullivan mistakenly believes this appeal to be a second trial in which this Court should reverse the trial court by reaching different factual conclusions from the proffered evidence. We cannot grant relief on that basis. See *Hill v City of Warren*, 276 Mich App 299, 308-309; 740 NW2d 706 (2007) (recognizing the deferential nature of the clear error standard of review and that this standard of review "must, by definition, accommodate the possibility of multiple 'right' results, or at least 'permissible' results").

In his brief, Sullivan argues only evidence that supports his conclusions while asking this Court to ignore any and all contrary evidence. Again, this is contrary to longstanding principles of appellate review. Furthermore, he has failed to demonstrate how, following a comprehensive review of the record, giving due regard "to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it," MCL 2.613(C), this Court could conclude that "a definite and firm conviction that a mistake was made." *Lawrence*, 314 Mich App at 220. Sullivan has thus failed to show that the trial court's factual findings he challenges on appeal with respect to the Pekkalas' breach of contract claim were clearly erroneous, and accordingly, he is not entitled to relief on this claim.

## B. SLANDER OF TITLE

Next, we turn to the Pekkalas' slander of title claim.

MCL 565.108 provides:

> No person shall use the privilege of filing notices hereunder for the purpose of slandering the title to land, and in any action brought for the purpose of quieting title to land, if the court shall find that any person has filed a claim for that reason only, he shall award the plaintiff all the costs of such action, including such attorney

fees as the court may allow to the plaintiff, and in addition, shall decree that the defendant asserting such claim shall pay to plaintiff all damages that plaintiff may have sustained as the result of such notice of claim having been so filed for record.

Slander of title is a claim with "both a common-law and statutory basis." *B&B Investment Group v Gitler*, 229 Mich App 1, 8; 581 NW2d 17 (1998). "To establish slander of title at common law, a plaintiff must show falsity, malice, and special damages, i.e., that the defendant maliciously published false statements that disparaged a plaintiff's right in property, causing special damages." *Id*.; see also *Anton, Sowerby & Assoc, Inc v Mr C'S Lake Orion, LLC*, 309 Mich App 535, 546; 872 NW2d 699 (2015). The malice element requires showing "some act of express malice, which implies a desire or intention to injure." *Anton, Sowerby & Assoc*, 309 Mich App at 547 (quotation marks and citation omitted). "Malice may not be inferred merely from the filing of an invalid lien; the plaintiff must show that the defendant knowingly filed an invalid lien with the intent to cause the plaintiff injury." *Id*. (quotation marks and citation omitted). Accordingly, "the malice necessary for a slander-of-title action does not exist when the offending party's actions rest on a rational, yet incorrect, interpretation of law." *Id*.

In this case, Sullivan argues that his claim of lien was not false because he "believed that the amount was for the amount owed $10,806.66 as well as for the amount of profits lost on the project in the amount of $29,000," and "[s]aid amount was not speculative as Sullivan testified that he passed up other projects and testified as to what amount was to be due under this contract." Sullivan further asserts that there was no malice in filing the claim of lien because he did not know which of the Pekkalas' parcels contained the garage structure.

Sullivan's arguments ignore the fact that the trial court dismissed his claim of lien as unenforceable before trial on a summary disposition motion. Although his appellate arguments suggest an attempt to relitigate the question whether his construction lien was enforceable, Sullivan does not explicitly challenge the underlying summary disposition ruling in this appeal and neglects to address in this context the ground on which his claim of lien was dismissed, i.e. that the claim of lien was unenforceable under MCL 570.1114 because the garage was a residential structure and there was no written contract. As such, Sullivan has abandoned any appellate challenge to the trial court's summary disposition ruling and the legal validity of the underlying construction lien. "[I]t is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments . . . ." *ATF Mich*, 497 Mich at 213 (quotation marks and citation omitted; ellipsis in original).[3]

---

[3] The trial court indicated that Sullivan's motion for reconsideration was denied, although it is not clear from the record when this occurred. Sullivan does not raise any issue on appeal regarding the trial court's treatment of the summary disposition ruling or the motion for reconsideration and any such issue is therefore abandoned. An issue is abandoned if the appellant fails to properly address the merits of the claim of error. *Twp of Grayling v Berry*, 329 Mich App 133, 154-155; 942 NW2d 63 (2019).

Furthermore, as with the breach of contract claim above, Sullivan misconstrues the standard of review on appeal with respect to the trial court's factual findings and merely attempts to argue in favor of his view of the evidence without giving us any legal or factual basis to conclude that the trial court clearly erred as opposed to merely having reached a permissible conclusion with which Sullivan disagrees. *Hill*, 276 Mich App at 308-309. Nonetheless, regardless of whether Sullivan's filing of a construction lien would have constituted slander of title on the basis of his original filing of a claim of lien before this action was initiated, Sullivan has not demonstrated that the trial court clearly erred by concluding after trial that Sullivan had slandered the title to the Pekkalas' property by refusing to discharge the lien in accordance with the trial court's summary disposition ruling and permitting it to remain as a cloud on the Pekkalas' title throughout these proceedings. See *Anton, Sowerby & Assoc*, 309 Mich App at 539, 546, 548-550 (holding that the trial court did not err by determining that the plaintiff's continued refusal to discharge a lien on the defendants' property after the plaintiff's legal duty to discharge the lien arose, even though the plaintiff had a statutory right to file the lien in the first instance, constituted slander of title and that "plaintiff's repeated failure to abide by the court's rulings and release the lien demonstrated malice"). As a consequence, Sullivan has not shown that he is entitled to any appellate relief with respect to the slander of title claim.

### C. PREVAILING PARTY UNDER THE CONSTRUCTION LIEN ACT

Next, Sullivan asserts:

> [A]s it relates to the "prevailing party" under the Construction Lien Act, no money should have been awarded to the Pekkalas. It is clear that this was commercial in nature and there was a written agreement and contract. Because of this, Sullivan should have prevailed on said claims.

Sullivan provides no further argument or analysis regarding this issue and cites no legal authority to support this cursory argument. It is therefore abandoned. *ATF Mich*, 497 Mich at 213.

### D. OTHER CLAIMS

Sullivan additionally argues that the trial court should have ruled in his favor on his claims against the Pekkalas for breach of contract, promissory estoppel, unjust enrichment, quantum meruit, fraudulent misrepresentation, innocent misrepresentation, civil extortion, exemplary damages, and the original claim of lien.

First, with respect to the claim of lien, this claim was also implicated in Sullivan's challenge to the trial court's slander of title ruling. His separate argument regarding the claim of lien suffers from the same deficiencies described above, and we conclude that he has likewise failed to demonstrate that he is entitled to any appellate relief regarding his claim of lien.

Next, with respect to Sullivan's breach of contract claim against the Pekkalas, his arguments are largely the same as those described above in the context of discussing the trial court's finding that Sullivan breached the contract. These arguments also are deficient for the same reasons in that Sullivan treats his appeal like a second trial and argues for a different

-10-

resolution of the conflicts in the evidence without showing how the trial court's factual findings were clearly erroneous under the proper standard of review. *Hill*, 276 Mich App at 308-309.

Sullivan raises one new argument in this portion of his appellate brief that merits further discussion. Sullivan argues that *Alan Custom Homes*, 256 Mich App 505, supports his contention that there was a written contract. He bases this argument on his theory that the case stands for the proposition that "that under MCL 570.1114, there was originally an oral contract, but then written change orders were agreed to and the court stated that it could be construed as a written contract." Sullivan contends that the various emails, invoices, and estimates that were generated after his initial meeting and oral agreement with John thus constitute a written contract under *Alan Custom Homes*.

In *Alan Custom Homes*, the plaintiff contractor "submitted written change orders and statements" to the homeowners "documenting the orally agreed to contract amendments," and the homeowners "did not object to these changes and accepted their benefits" without apparently signing any of the change orders or statements. *Alan Custom Homes*, 256 Mich App at 515. This Court held that the requirement in MCL 570.1114 "of a writing for additions and amendments *to a written contract* was fulfilled." *Alan Custom Homes*, 256 Mich App at 515 (emphasis added). Crucially, however, the parties in *Alan Custom Homes* had an original written contract for the construction work, as also required by MCL 570.1114, that constituted the essential governing agreement for the project. *Alan Custom Homes*, 256 Mich App at 515-516. Such circumstances are not present in this dispute. Here, the trial court found that the parties' original agreement was an oral one and that their original agreement was not set forth in a written contract, and Sullivan has not demonstrated clear error with respect to this factual finding by the trial court. Thus, *Alan Custom Homes* is distinguishable from the instant case and Sullivan's reliance on that case is unavailing.

Finally, with respect to his remaining claims, Sullivan asserts that the trial evidence supported these claims. However, we are not persuaded by these arguments because, again, Sullivan fails to address or discuss the trial court's factual findings that were contrary to Sullivan's view of the evidence and on which the trial court based its rulings dismissing these claims. Sullivan also continues his erroneous approach to the clear error standard of review regarding the trial court's factual findings. *Hill*, 276 Mich App at 308-309. Thus, Sullivan has abandoned these arguments by failing to properly address his claims of error and by failing to explain how he believes the trial court erred. *ATF Mich*, 497 Mich at 213; *Twp of Grayling v Berry*, 329 Mich App 133, 154-155; 942 NW2d 63 (2019). Accordingly, he has failed to demonstrate an entitlement to any form of appellate relief with respect to these claims.

Affirmed. Defendants having prevailed in full are entitled to costs. MCR 7.219(A).

/s/ Stephen L. Borrello
/s/ David H. Sawyer
/s/ Deborah A. Servitto

-11-